# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00550-CR

**Sergeant Hollis aka Sargent Hollis, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT
## NO. A-04-0385-S, HONORABLE BEN WOODWARD, JUDGE PRESIDING

## O P I N I O N

Appellant Sargent Hollis appeals his convictions for intentionally and knowingly manufacturing a controlled substance, methamphetamine, weighing between 4 and 200 grams including adulterants and dilutants (count I) and intentionally and knowingly possessing an immediate precursor, ephedrine or pseudoephedrine, with the intent to unlawfully manufacture methamphetamine (count II). *See* Tex. Health & Safety Code Ann. § 481.102(6) (West Supp. 2006), § 481.112(a), (d) (West 2003). The court assessed punishment at fifteen years' confinement on count I and five years' confinement on count II, to run concurrently. Hollis contends in a single issue that his attorney provided ineffective assistance of counsel by failing to (1) file a motion to suppress evidence, (2) engage in meaningful voir dire, and (3) object to nine specific pieces of evidence or portions of testimony offered during the trial. We will affirm.

## BACKGROUND

Around midnight on December 15, 2003, Trooper Jack McCrea was patrolling the San Angelo area with Corporal Bart Teeter. McCrea testified that, while driving "northbound on U.S. 67 at the Tom Green County and Runnels County line near the San Angelo feed yards," he and Teeter "smelled a strong odor of ether coming out of the southeast," which he considered to be unusual for that area at that time of night. McCrae described the odor as "real strong" and "distinct." As a result, they drove down the highway, turned around, "and came back to confirm that [ether] was what both of us did smell." They "kept circling until [they] pinpointed where it was coming from" and eventually determined that the odor was coming from the old Four Winds Dance Hall—a building that was no longer used for such commercial purposes.

McCrea explained that "ether is one of the main ingredients for extracting the ephedrine out of the pseudoephedrine tablets." Based on these observations and his experience, he "thought somebody was probably cooking methamphetamine at the time." McCrea therefore called a DPS narcotics officer, Vincent Luciano, to come to the scene. During the forty-five minutes that McCrea and Teeter were waiting for Luciano, they observed the building to make sure no one entered or exited and also did surveillance of the building.

When Luciano arrived, he confirmed the odor. The three officers then devised a plan to "knock on the door and ask if everything was okay." As they approached, the officers observed "a brown Jeep Cherokee with the hood up, parked facing the building, with the engine running, and different types of electrical cords coming from the battery or the motor-engine compartment." The

2

Jeep was being used as a generator because there was no power in the building. The officers could also hear loud music inside.

Luciano testified that he knocked on the door and said "police." He identified Hollis in court as the man who answered the door. Luciano testified that Hollis "didn't give [the officers] any hassle" and let them inside. Hollis testified that he opened the door and "told them: Yeah, come right on in." Luciano testified that when Hollis opened the door, Luciano "was hit with a much stronger odor that was more indicative of the production of methamphetamine. Both the ether odor and the ammonia hit me at once." Luciano subsequently described what he saw as a "clandestine meth lab"—a "secret or hidden place where people illegally produce methamphetamine." Luciano had handled approximately 70 narcotics cases per year since 1998 and had focused on the investigation of meth labs since 2001.

The officers immediately conducted a "protective sweep" of the dance hall. McCrea testified that this "means walking around and making sure there's nobody loose or there's no weapons laying around or anything like that." He further explained that officer safety is a large concern when entering a meth lab because the chemicals used are dangerous and may explode and because the people involved with the production of methamphetamine are often dangerous. Luciano testified that Bobby Oxford and Sonny Robeson were discovered during the protective sweep in a

3

small room to the left of the door that Hollis had answered.[1]  Oxford and Robeson were detained in that room under McCrea's supervision.

McCrea and Luciano testified about various items that the officers saw in plain view during the sweep, including: a loaded .22 caliber rifle, "a gallon jar with some type of liquid in it," a glass "pickle jar" that was "filled with a liquid and solid substance" and had a "white powdery residue in the bottom of it," "a fire extinguisher that we believe contained anhydrous ammonia," "a plastic baggie with a white powder substance," some paper towels laying on a table that had "white residue consistent with the starchy-type out of the pills," "a scale," "some plastic tubing," and other "drug paraphernalia."  According to McCrea, "there was stuff laying just everywhere."  None of the items were seized at that point, except the rifle, which McCrea unloaded and placed behind the bar area for safety.  Both McCrea and Luciano testified that the items observed in plain view were consistent with the components used to manufacture methamphetamine and that, based on their observations up to that point, they had probable cause to believe that Hollis, Oxford, and Robeson were manufacturing methamphetamine inside the dance hall.

Luciano explained that "at that point we realized we were going to need a search warrant," so they contacted a justice of the peace.  Luciano typed up the warrant using the laptop computer in McCrea's vehicle, and the JP signed it when he arrived at the scene.  Meanwhile, Hollis, Oxford, and Robeson were handcuffed, taken outside, and placed in police cars.  Luciano explained

---

[1]  A diagram of the dance hall was admitted into evidence.  It shows that the dance hall consisted of one large, rectangular room (the area the officers initially entered upon Hollis opening the front door) with one small room immediately to the left and two restrooms in the back.  There was also a porch on the outer right side of the dance hall and two "out buildings" behind it.

that this was necessary because the chemical vapors in the building were so strong that they could harm the suspects.

After obtaining the warrant, the officers conducted a more extensive search. Luciano testified about what was discovered as a result: a large bottle of liquid and solvent, a yellow plastic bag containing pills, a tin container with three baggies of suspected methamphetamine, a small plastic bag of methamphetamine powder, a container of salt, camp fuel, starter fluid, Red Devil Lye, acetone, pipes, scales, plastic tubing, test tubes, empty baggies, gloves, matches, a tool box with jars and filters, batteries, cotton swabs, a pitcher, syringes, an air pump, a gas generator, and a rifle. The officers also discovered a burn pit in the back of the building containing partially destroyed evidence. Photographs of the scene depicting these items and the items previously observed in plain view were admitted into evidence. Luciano testified about the role each of these items plays in manufacturing methamphetamine. A DPS chemist, Dennis Hambrick, testified that the tests he conducted of several items tested positive for methamphetamine and ephedrine or pseudoephedrine in varying amounts.

Lucaino testified that, following the search, Hollis, Oxford, and Robeson were arrested and taken to the Tom Green County Jail, where they were interviewed. Photographs taken at the jail were admitted into evidence, including the suspects' mug shots and up-close pictures of their hands. Luciano explained that the "reason we photograph hands is, when you handle these chemicals . . . you start getting all kinds of discoloration and blisters and what-have-you from the extreme temperatures associated with and the caustic materials of producing methamphetamine." Hollis's and Robeson's hands appear discolored and blistered in the photos, and Luciano testified

5

that he also recalled Oxford's hands having "significant discoloration." Photographs of Oxford and his inner arm were also admitted. Luciano testified that he believed Oxford to be Hollis's nephew and that the appearance of his arm indicated "intravenous drug use."

Luciano then testified about Hollis's interview and his resulting written statement. He testified that Hollis was read his *Miranda* rights and that the rights were also typed at the top of the page on which his statement was written. *See Miranda v. Arizona*, 384 U.S. 436 (1966); Tex. Code Crim. Proc. Ann. art. 38.22 (West 2005). Hollis was given the option to write his own statement but declined, stating that he "didn't like to write" and would prefer that Luciano transcribe Hollis's oral statement. Luciano testified that he wrote down the words exactly as Hollis said them, then read them back verbatim, line-by-line. After Hollis agreed to the content, Luciano initialed the end of each line to ensure that "nobody else could add anything to it." Lieutenant John Waits witnessed the taking of Hollis's statement and confirmed Luciano's description of the process. Hollis, Luciano, and Waits signed the statement. Hollis's statement was read to the jury in full:

> I used to use a needle. Every once in a while I smoke speed.[2] I knew what was going on out there when I'm there. I am not making speed. I like to smoke speed. I never took any anhydrous—I never took any anhydrous out there. I took pills out there so I don't have to pay out of my own pocket once in a while. I took the rap for Tony Carvella on some dope that wasn't mine.

Luciano further testified that, while in custody, Hollis stated that "I ain't going to be—I ain't going to be a snitch. I know what you want. You want Jimmy [Jackson]." Luciano

---

[2] Luciano testified, and Hollis does not contest, that the term "speed" is "slang for methamphetamine."

6

testified that Jackson was leasing the property on which the old Four Winds Dance Hall was located and was in the process of purchasing the property; Jackson had also been charged in this case.

Hollis testified that he is a mechanic and a painter and that the reason he was on the property was to fix a motor for Jackson. He claimed that he was working on the car around midnight when the police arrived, had no idea what was going on inside, and had just entered the building to warm up when Luciano knocked on the door. Hollis claimed that the strong odor smelled by the officers resulted from the fact that the surrounding field had been plowed and sprayed with a chemical substance earlier that day. Hollis confirmed that Oxford is "my little nephew."

Hollis also testified about the written statement he gave while in custody. He acknowledged that Luciano had read him back the statement line-by-line and that he believed it was accurate at the time but felt Luciano had used different words in court. Because he is illiterate, he was unsure. Regarding his statement that he "used to use a needle," Hollis claimed that it referred to his teenage years. He admitted that he used to have a drug problem but that, since having children, he had changed. Nevertheless, he also testified that on December 15, 2003, he "did like smoking speed. . . . Yes, it's still true." When asked about his statement that he "knew what was going on out there," Hollis explained that, even if he knew that Jackson and others sometimes manufactured methamphetamine on the property, he would not agree to work on cars out there when that was happening. Finally, regarding his statement that he "took pills out there so [he didn't] have to pay out of [his] own pocket," Hollis testified that "[o]nce in a while . . . I did [take] . . . like a box [of pills] or something like that. I could get colds all the time anyway and I keep them pills, you know, anyway." Further, when asked what the pills were "payment" for, Hollis said, "[Jackson]

would turn me on every now and then, he would. . . . Just a little bit where I could smoke." The prosecutor asked him, "So just to clarify what you were saying . . . when you said [Jackson] turned you on every once in a while, he gave you methamphetamine to use?" Hollis replied, "Once in a while. . . . Yes, he did. . . . I smoke it."

Hollis's niece, Penny Perkins, and her husband, Steven, were also called to testify on Hollis's behalf. They both testified that Hollis worked as a mechanic, painter, and carpenter and that they knew Hollis went to Jackson's property to perform auto mechanic services. Sometimes Steven would help Hollis with this work. Steven testified that Jackson paid Hollis with cash, not methamphetamine. Steven also testified, however, that he was aware Jackson manufactured methamphetamine at the dance hall and that Jackson supplied Steven with methamphetamine. Penny testified that she never noticed any strong odors while on the property.

In closing, Hollis's attorney argued that Hollis should be acquitted because there was no evidence that Hollis possessed anything and no evidence that he intentionally did anything besides work on a car. Counsel emphasized Hollis's corroborated testimony that he was on the property to perform mechanic work, which explains the callouses and discoloration on his hands, and that he was compliant when the police arrived because he had nothing to hide. Counsel urged that Hollis had nothing in his possession and claimed that the only incriminating item in the same room with Hollis was the pickle jar—and it was "25 feet away from him, in the dark." Counsel pointed out that the other men (Robeson, Oxford, and Jackson) were not called to testify and that, possibly, this was because they would say that Hollis was simply a mechanic. He urged that even if methamphetamine was being manufactured out there, there was no indication that Hollis had any role in it, and argued

8

that mere presence at the scene was not enough to convict. He also urged that anything in Hollis's statement about past drug use was not evidence to support the present charges. Counsel concluded by saying, "I ask you, I beg you, to return a verdict of not guilty and say by your verdict not guilty as to both counts."

**ANALYSIS**

In a single issue, Hollis challenges his conviction on the ground that he was denied his Sixth Amendment right to effective assistance of counsel. Specifically, he claims that his counsel was ineffective because he failed (1) to file a motion to suppress the evidence obtained during the officers' search of the Four Winds Dance Hall and Hollis's statement, (2) to conduct a meaningful voir dire because it was too brief and did not explain the "law of parties," and (3) to object to nine pieces of evidence or portions of testimony that were either inadmissible or unreasonably prejudicial.

The standard announced in *Strickland v. Washington*, 466 U.S. 668, 694 (1984), governs whether Hollis satisfied his burden to prove that his counsel's assistance was ineffective. *See Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999). Pursuant to *Strickland*, Hollis must demonstrate that (1) his counsel's performance was deficient, i.e., it fell below an objective standard of reasonableness, and (2) Hollis was prejudiced because a reasonable probability exists that, but for the deficient performance, the outcome of his trial would have been different. 466 U.S. at 687-88, 694; *Ex parte Cash*, 178 S.W.3d 816, 818 (Tex. Crim. App. 2005).

We review counsel's representation in its totality, rather than as isolated acts or omissions, and we evaluate the performance from counsel's perspective at trial, rather than in hindsight. *Stafford v. State*, 813 S.W.2d 503, 506 (Tex. Crim. App. 1991); *Wilkerson v. State*, 726

9

S.W.2d 542, 548 (Tex. Crim. App. 1986). Further, we indulge a strong presumption that counsel's acts and omissions were reasonable and part of a sound trial strategy, and it is the appellant's burden to overcome that presumption with a preponderance of the evidence. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994); *Moore v. State*, 694 S.W.2d 528, 531 (Tex. Crim. App. 1985). Our review is highly deferential to counsel, and we will not speculate about counsel's trial strategy. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002); *Mayhue v. State*, 969 S.W.2d 503, 511 (Tex. App.—Austin 1998, no pet.). The appellant, however, may prevail by providing a record that affirmatively demonstrates counsel's performance was not based on sound strategy. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001); *Mayhue*, 969 S.W.2d at 511. If the appellate record is silent regarding the reasons for counsel's conduct—as it is in most cases—then it is insufficient to overcome the presumption that counsel followed a legitimate strategy. *Tong v. State*, 25 S.W.3d 707, 714 (Tex. Crim. App. 2000); *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999).

We will consider each of appellant's arguments in turn.

**Motion to Suppress**

A trial counsel's failure to file a motion to suppress is not per se ineffective assistance of counsel. *See Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). Counsel is not required to engage in the filing of futile motions. *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991). Rather, to satisfy the *Strickland* test and prevail on an ineffective assistance claim premised on counsel's failure to file a motion to suppress, an appellant must show by a preponderance of the evidence that the result of the proceeding would have been different—i.e., that the motion to suppress would have been granted and that the remaining evidence would have been insufficient to

10

support his conviction. *Jackson v. State*, 973 S.W.2d 954, 956-57 (Tex. Crim. App. 1998). To meet his burden, Hollis is required to produce evidence that would defeat the presumption of proper police conduct. *Id.* at 957. This requires Hollis to develop facts and details of the search sufficient to conclude that the search was invalid. *Id.*

Hollis claims that the officers lacked probable cause to conduct the protective sweep of the Four Winds Dance Hall and to initially detain the three suspects. He further claims that, because the evidence that was used to support the subsequent warrant was obtained through these illegal procedures, the resulting search of the dance hall and the arrest of the suspects were also illegal—meaning that all the evidence seized from the dance hall and the statement given by Hollis while in custody should have been suppressed as fruits of a poisonous tree. He argues that, because there was a high probability of success on such a motion and because the suppression of this evidence would have resulted in his acquittal, this Court should deem his trial counsel's performance ineffective and reverse his conviction.

We will assume for purposes of our review that Hollis correctly argues that, had all the evidence and his incriminating statement been suppressed, he would have been entitled to a verdict of not guilty. The more important question in this case is whether Hollis's counsel had reason to determine that the search and arrest were lawful and resulted in no violations of Hollis's constitutional rights. If so, then a pretrial motion to suppress and/or objections to the admission of the evidence would have been useless, and counsel's performance would not be ineffective.

The State argues that a motion to suppress would have been futile in this case because Hollis had no reasonable expectation of privacy in the dance hall and, in any event, Hollis consented

11

to the officers' entry, which led to the officers' plain view of a meth lab in combination with their detection of odors commonly associated with the manufacture of methamphetamine, thereby providing probable cause for the resulting search and arrest.

The Fourth Amendment, made applicable to the states by the Due Process Clause of the Fourteenth Amendment, provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV; *Villarreal v. State*, 935 S.W.2d 134, 136 n.1 (Tex. Crim. App. 1996). In order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he or she personally has an expectation of privacy in the place searched and that the expectation is reasonable. *Rakas v. Illinois*, 439 U.S. 128, 140 (1978); *Granados v. State*, 85 S.W.3d 217, 222-23 (Tex. Crim. App. 2002). An accused lacks standing to challenge the admission of evidence obtained by searching an area in which he or she does not have a legitimate expectation of privacy. *Rakas*, 439 U.S. at 143; *Calloway v. State*, 743 S.W.2d 645, 651 (Tex. Crim. App. 1988).

The factors that we are to consider in determining whether an accused has standing to challenge the search include: (1) whether the alleged aggrieved person has a property or possessory interest in the thing seized or the place searched; (2) whether he was legitimately on the premises; (3) whether he had complete dominion or control and the right to exclude others; (4) whether, prior to the search, he took normal precautions customarily taken by those seeking privacy;

12

(5) whether the property was put to some private use; and (6) whether the claim of privacy is consistent with historical notions of privacy. *Calloway*, 743 S.W.2d at 651.[3]

The evidence here is undisputed that Hollis had no property or possessory interest in the Four Winds Dance Hall. The property was owned by a third party and was being leased by Jimmy Jackson, an acquaintance of Hollis who supposedly employed him on occasion to work as a mechanic. Although Hollis was legitimately on the premises as Jackson's guest, he was not an overnight guest and had no personal belongings stored on the property. Further, Hollis exercised no dominion or control over the property, had no right to exclude others from the property,[4] and had not taken any precautions to ensure his privacy on the property. Although the property was put to private use in the sense that it was used as a clandestine meth lab, such employment of a run-down, otherwise abandoned dance hall is not a private use consistent with historical notions that society is prepared to protect. Additionally, there is no evidence that anyone used the property as a private residence.[5] Therefore, the six factors that guide our analysis weigh heavily toward determining that

---

[3] Hollis fails to address whether or not he has standing to contest the admissibility of evidence obtained from the sweep and search of the dance hall. Although Hollis carries the burden to present argument and supporting evidence on this claim and has therefore waived error, we address the merits in the interests of justice. *See Jackson v. State*, 973 S.W.2d 954, 956-57 (Tex. Crim. App. 1998) (appellant carries burden on ineffective assistance of counsel claim); *Calloway v. State*, 743 S.W.2d 645, 650 (Tex. Crim. App. 1988) (accused carries burden to establish that he had reasonable expectation of privacy).

[4] Hollis testified that, often when he was on the property, other people whom he did not know came and went at the direction of Jackson. There was no evidence that Hollis had any authority to control the comings and goings of other people on the property.

[5] Although one of the outbuildings was referred to as the "living quarters," Luciano clarified that it was actually a "little shed" where "there's no water, there's no electricity out there, so it's being kind [to] call it 'living quarters.' There was a bucket they were using as a restroom and just kind of trash everywhere."

13

Hollis had no reasonable expectation of privacy in the Four Winds Dance Hall and, accordingly, that he lacks standing to contest the admissibility of the evidence obtained from the protective sweep or search of the dance hall. This determination is consistent with existing precedent.

In *Villareal*, the court of criminal appeals held that an appellant who was an invited (but not an overnight) guest in a private home had no reasonable expectation of privacy in that home. 935 S.W.2d at 139. The court noted that there was no evidence that the appellant had a property or possessory interest in the residence, nor unrestricted access to it; no evidence that the appellant had dominion or control over the residence, nor the right to exclude others from it; and no evidence that the appellant intended to stay overnight. *Id.* Thus, the court concluded that "American society is not willing to sanction as objectively reasonable the subjective expectation of privacy of someone who is in a residence under the circumstances presented in this case." *Id.*; *see also Gouldsby v. State*, 202 S.W.3d 329, 335 (Tex. App.—Texarkana 2006, pet. ref'd) (appellant had no standing to contest admissibility of evidence obtained in search of home where he was invited but not overnight guest); *Meridyth v. State*, 163 S.W.3d 305, 309-10 (Tex. App.—El Paso 2005, no pet.) (society is not prepared to protect appellant's expectation of privacy where appellant, as guest on property leased by his brother, was hiding in barn with cocaine in his possession); *Davis v. State*, 119 S.W.3d 359, 368 (Tex. App.—Waco 2003, pet. ref'd) (appellant had no legitimate expectation of privacy in residence where there was no evidence that person who supposedly gave appellant permission to be at residence was owner or anyone having any authority to authorize such presence).

Based on the fact that Hollis had no reasonable expectation of privacy in the dance hall and, therefore, had no standing to contest the admission of evidence obtained in searching the

14

dance hall, Hollis has not shown that he would have prevailed if his attorney had filed a motion to suppress this evidence. *See Jackson*, 973 S.W.2d at 957. Consequently, his ineffective assistance of counsel claim fails as to this claim.[6]

The issue remains, however, whether Hollis's counsel was ineffective in not filing a motion to suppress Hollis's statement, which contains Hollis's admission that he "took pills out there so [he didn't] have to pay out of [his] own pocket." Hollis contends that the statement should have been suppressed because it was obtained pursuant to an invalid, warrantless arrest.[7]

Warrantless arrests in Texas are authorized only in limited circumstances and are governed primarily by chapter 14 of the code of criminal procedure. *Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005). Article 14.03(a)(1) authorizes the warrantless arrest of a person found in a suspicious place and under circumstances that reasonably show an offense has been or is about to be committed. Tex. Code Crim. Proc. Ann. art. 14.03(a)(1) (West Supp. 2006). There must still be probable cause to make the arrest. *Weide v. State*, 157 S.W.3d 87, 98 (Tex. App.—Austin 2005, pet. ref'd). The proper inquiry under article 14.03(a)(1) is to look at the "totality of circumstances

---

[6] Hollis argues that there were no exigent circumstances to justify a warrantless search. Based on our conclusion that he lacked a reasonable expectation of privacy in the dance hall, we need not address this contention. And, in any event, Hollis consented to the officers' entry; according to his testimony, he "told them: Yeah, come right on in." *See United States v. Gould*, 364 F.3d 578, 587 n.9, 590 (5th Cir. 2004) (no exigent circumstances are needed to justify warrantless search if consent is given; court held that protective sweep following "knock and talk" entry with consent of guest in home, without warrant or exigent circumstances, was constitutional); *Allridge v. State*, 850 S.W.2d 471, 493 (Tex. Crim. App. 1991) (warrantless search is permissible with consent).

[7] Hollis complains that both his initial detention and his formal arrest following execution of the warrant were improper. We do not distinguish between these two because we assume without deciding for purposes of this appeal that Hollis was "arrested" when he was initially handcuffed and placed in the police vehicle. The issue turns on whether or not that action was authorized.

15

[] to find first, probable cause that the defendant committed [or was about to commit] the crime and second, to find that the defendant was in a suspicious place." *Dyar v. State*, 125 S.W.3d 460, 467 (Tex. Crim. App. 2003) (citing *Muniz v. State*, 851 S.W.2d 238, 251 (Tex. Crim. App. 1993)).

Probable cause to arrest exists if, considering the officer's knowledge at the time and the surrounding circumstances, a prudent person would believe that the suspect had committed or was about to commit an offense. *Parker v. State*, 206 S.W.3d 593, 596 (Tex. Crim. App. 2006); *Torres v. State*, 868 S.W.2d 798, 801 (Tex. Crim. App. 1993). The determination of whether a place is a "suspicious place" is a highly fact-specific analysis. *Dyar*, 125 S.W.3d at 468. A place may become suspicious because of facts and circumstances known to the officer and any reasonable inferences that can be drawn from those facts. *Goldberg v. State*, 95 S.W.3d 345, 363 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). Although not limited to such circumstances, a place may be classified as "suspicious" when a police officer reasonably believes that a crime occurred there and/or specific evidence directly connects the defendant or the place with the crime. *See id.* (citing *State v. Parson*, 988 S.W.2d 264, 268-69 (Tex. App.—San Antonio 1998, no pet.)); *see also Swain*, 181 S.W.3d at 366.

The officers in this case had probable cause to arrest Hollis based on the facts within their knowledge and the surrounding circumstances at the time they initially entered and swept the dance hall. Prior to entering the building, the officers smelled a strong odor of ether emanating from the area. Both McCrea and Luciano testified that, based on their training and prior experiences with narcotics investigations, they associated this smell with the production of methamphetamine. Furthermore, Luciano testified that, when Hollis opened the door to the dance hall, the odor became

16

much more powerful, confirming their suspicion that the smell was coming from inside the building where Hollis was located. A trained officer's detection of distinctive odors associated with narcotics is competent evidence to be considered in establishing probable cause. *See Parker*, 206 S.W.3d at 599-600; *McNairy v. State*, 835 S.W.2d 101, 106 (Tex. Crim. App. 1991); *Lowery v. State*, 843 S.W.2d 136, 142 (Tex. App.—Dallas 1992, pet. ref'd).

Upon entry, the officers observed in plain view multiple components of a meth lab, including glass jars, paper towels, and baggies that each contained a white powdery substance; a scale; plastic tubing; and other drug paraphernalia that was "laying everywhere." The officers explained the role that these particular items play in the production of methamphetamine and why, given their prior experiences with meth labs, observing these particular items caused them to believe that the three men inside the building, including Hollis, were actively manufacturing methamphetamine. Further, the jeep outside, which had cables running inside to generate power, indicated that the production was underway at the time, and the appearance of the men's hands, which were discolored and blistered, indicated that these three men were the ones producing the methamphetamine. These circumstances would lead a prudent person to believe that Hollis had committed the offense of manufacturing methamphetamine. *See Brown v. State*, 757 S.W.2d 828, 829 (Tex. App.—Waco 1988, pet. ref'd) (appellants' proximity to meth lab, provision of electricity to lab, possession of base chemicals for methamphetamine manufacture, and presence of strong odor of methamphetamine supported convictions for methamphetamine manufacturing); *East v. State*, 722 S.W.2d 170, 171-72 (Tex. App.—Fort Worth 1986, pet. ref'd) (appellants' presence in and control of home containing "inactive" amphetamine laboratory used by a third party,

17

presence of odor associated with manufacture of drugs, and presence of amphetamine supported convictions for amphetamine manufacturing).

Moreover, the dance hall was a "suspicious place" within the meaning of article 14.03(a)(1). *See* Tex. Code Crim. Proc. Ann. art. 14.03(a)(1). A strong odor of ether was emanating from the dance hall, the building's legitimate commercial purposes had been abandoned, it served no residential purpose, and it was located in a secluded area. Luciano, who was trained in narcotics investigations, associated these smells and location with a "clandestine meth lab." An officer's reasonable belief that a crime has occurred at the place can make the place "suspicious." *Goldberg*, 95 S.W.3d at 363. Additionally, it was midnight, there was loud music coming from inside, and the only power in the building was being supplied from a vehicle sitting out front. All of these circumstances, viewed collectively, make the dance hall suspicious at the time in question.

Because the officers had probable cause to believe Hollis had committed an offense and they discovered Hollis in a suspicious place, they were justified in arresting him without a warrant pursuant to article 14.03(a)(1).[8] Consequently, any statements obtained from Hollis while

---

[8] Hollis relies on *State v. Steelman*, 93 S.W.3d 102 (Tex. Crim. App. 2002), to support his claim that his arrest was unjustified. *Steelman* is distinguishable. In *Steelman*, the officers had received an anonymous tip that drug dealing was taking place at the residence and they smelled marijuana from outside the home. *Id*. at 103. When Steelman, a resident of the home, answered the door, he did not provide the officers consent to enter and actually attempted to close the door behind him to keep the officers outside. *Id*. at 104-05. The officers then "burst through the doorway." Even then, however, the officers observed nothing illegal. Nevertheless, the officers arrested all the occupants. *Id*. at 105. The court held that the tip and smell of marijuana coming from inside the home were not, on their own, enough to establish probable cause that Steelman had committed an offense within the officers' presence under article 14.01. *Id*. at 108.

Hollis's case is different because (1) the officers' initial entry was lawful based on Hollis's consent, *see id.* at 107, 110; (2) their initial sweep did not violate Hollis's constitutional rights

18

in custody were not fruits of an illegal arrest, and thus his counsel's performance was not deficient in failing to move to suppress them because it is unlikely that such a motion would have been successful. *See Mooney*, 817 S.W.2d at 698.

Additionally, regarding both the evidence obtained from the search of the dance hall and Hollis's statement given while in custody, the record is silent as to counsel's trial strategy, if any, in failing to file a motion to suppress. Hollis did not file a motion for new trial on his claim of ineffective assistance of counsel. Absent record evidence, we must not speculate as to trial counsel's strategy. *Jackson*, 877 S.W.2d at 771. When a record is silent as to trial counsel's strategy, we "will not conclude the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it." *Garcia v. State*, 57 S.W.3d 436,

---

because he had no reasonable expectation of privacy; and (3) based on what the officers observed up to that point, they had more evidence than just the smell of ether to establish probable cause to arrest Hollis: in addition to the multiple items in plain view evidencing a meth lab, the appearance of Hollis's hands also alerted the officers to Hollis's participation in the offense. This is unlike *Steelman*, where the officers saw nothing illegal until *after* the arrest and there was nothing to connect Steelman, personally, to the suspected offense. *Id*. at 109. Also, *Steelman* was based on article 14.01, whereas the facts in Hollis's case satisfy article 14.03. *See* Tex. Code Crim. Proc. Ann. art. 14.01 (West 2005), art. 14.03 (West Supp. 2006).

We also note that the court of criminal appeals recently clarified that *Steelman* does not hold that the odor of drugs is insufficient to establish probable cause that someone had committed or was committing an offense. *Parker v. State*, 206 S.W.3d 593, 598 (Tex. Crim. App. 2006). Rather, "*Steelman* simply reiterated what previously had been well established: the odor of marijuana emanating from a residence, by itself, is insufficient to establish *both* the probable cause *and* statutory authority required for a warrantless arrest of a particular person inside." *Id*. In *Parker*, as here, considering the drug odors in the "totality of information," there was sufficient evidence to establish probable cause, and the warrantless entry was justified (there, based on exigent circumstances; here, based on consent). *Id*. at 601.

19

440 (Tex. Crim. App. 2001). Rather than being outrageous, the record here supports counsel's decision to not file a motion to suppress.

Hollis has failed to demonstrate ineffective assistance based on his counsel's failure to file a motion to suppress.

**Voir Dire**

The second argument made by Hollis in support of his claim that he received ineffective assistance is that his counsel failed to conduct any meaningful voir dire because it was brief and failed to discuss the law of parties.

During the State's voir dire, the prosecutor stated, "another issue I wanted to touch on is called law of the parties," and then explained why, in order for the State to meet its burden of proof, the State had to prove more than Hollis's mere presence at the crime scene; it must prove his participation in the crime. *See* Tex. Penal Code Ann. § 7.01 (West 2003) (all parties to an offense who participated by their own conduct or conduct for which they are criminally responsible may be convicted; traditional distinctions between principals and accomplices are abolished), § 7.02 (West 2003) (explaining when one can be held "criminally responsible" for another's conduct). During the defense's voir dire, Hollis's counsel said, "mere presence, the Judge will tell you and as the District Attorney told you, is not evidence of guilt. We—everybody can all be in the wrong place at the wrong time." According to Hollis, this was an insufficient explanation. We disagree.

The jury was made aware of the fact that they could not find Hollis guilty based on his "mere presence" at the dance hall through the explanations of the prosecutor, the instructions of the court, and the inclusion of an instruction in the charge on the law of parties. Furthermore,

20

Hollis's counsel touched on this concept in his voir dire, attempted to establish during trial the defensive theory that Hollis was a nonparticipant in any manufacturing of methamphetamine that was occurring (attempting to show, instead, that Hollis was only present as an auto mechanic), and argued for Hollis's innocence based on this theory at closing. Hollis has failed to show (or even allege) that anything about his counsel's voir dire prejudiced the outcome of his case. *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (counsel's failure to ask any questions during voir dire, when prosecutor already covered relevant topics, was not ineffective because it can be legitimate trial strategy for counsel not to want to appear repetitious or wasteful of jury's time); *Hathorn v. State*, 848 S.W.2d 101, 120 (Tex. Crim. App. 1991) (counsel's voir dire was not ineffective by failing to question jurors on matters previously asked and about which court provided instructions).[9]

Hollis cites only *Ex parte Welborn*, 785 S.W.2d 391 (Tex. Crim. App. 1990), in support of his claim. Hollis, however, misreads *Welborn*. There, the court ultimately found trial counsel ineffective because he was unfamiliar with the nature of the case and had failed to properly investigate it, not because his voir dire was insufficient. *Id*. at 396. Counsel's confusion on the applicability of the law of parties during voir dire was simply one factor among many showing his

---

[9] Our sister court has addressed this issue specifically in terms of the law of parties. *See Harmon v. State*, No. 14-93-00971-CR, 1997 Tex. App. LEXIS 2932, at *15 (Tex. App.—Houston [14th Dist.] June 5, 1997, no pet.) (not designated for publication) (counsel was not ineffective for failing to repeat topics in voir dire, including law of parties, that had been covered in State's voir dire); *Garrett v. State*, No. 14-94-0032-CR, 1996 Tex. App. LEXIS 855, at *2 (Tex. App.—Houston [14th Dist.] Feb. 29, 1996, no pet.) (not designated for publication) ("counsel's decision to not discuss law of parties was proper trial strategy" because it is "a theory which benefits only the State").

deficient performance based on his unfamiliarity with the case. *Id*. Moreover, in *Welborn*, which was a habeas corpus proceeding, there was a record on which the court could review counsel's trial strategy. *Id.* at 392. Here, there is no such record. When the record is silent regarding counsel's trial strategy, we will not speculate about why counsel acted as he did. *Jackson*, 877 S.W.2d at 771-72. Instead, we will presume that counsel had a plausible reason for asking the questions he did and that he acted within the range of reasonable professional assistance. If anything, unlike *Welborn*, the record in this case shows that counsel understood the theory and attempted to prove that Hollis was innocent because he was merely present at the scene as an auto mechanic and was not a participant in the crime.

Hollis also complains, generally, about the fact that his counsel's voir dire was brief. However, a brief voir dire need not be equated with ineffectiveness of counsel. *Jackson v. State*, 491 S.W.2d 155, 156 (Tex. Crim. App. 1973). The length may be dictated by the trial strategy of counsel. *Id*. And, as noted above, topics otherwise covered by the court or the prosecutor need not be repeated. *See Boitnott v. State*, 48 S.W.3d 289, 294 (Tex. App.—Texarkana 2001, pet. ref'd). Here, Hollis's counsel described the presumption of innocence, explained why search warrants are necessary, and discussed that jurors cannot apply personal biases to the case, that the State must prove each and every element, the high burden of proof that the State must carry, and that the jurors must base their verdict solely on what they hear in the evidence. We cannot conclude that such a voir dire "constitutes conduct so outrageous that no competent attorney would have engaged in it." *Goodspeed*, 187 S.W.3d at 392. Again, in the face of a silent record, we will not speculate about counsel's strategy. *Jackson*, 877 S.W.2d at 771-72. Moreover, although counsel's voir dire was not

22

as long as the prosecutor's, nothing in the record shows that the outcome of Hollis's case would have been different had his counsel conducted a more extensive voir dire. *See Bone*, 77 S.W.3d at 834 (counsel's 30-minute voir dire was not ineffective because "[n]othing in the record proves that counsel's voir dire was the product of an unreasoned or unreasonable strategy, or that there was a fair probability that it led to either an unreliable guilty verdict or unjust punishment"); *Brown v. State*, 797 S.W.2d 686, 687 (Tex. App.—Houston [14th Dist.] 1990, no pet.) (counsel's representation was not deficient simply because appellant's voir dire was not as lengthy as State's).

Hollis has failed to demonstrate ineffective assistance based on his counsel's failure to more fully explain the law of parties during voir dire or to conduct a lengthier voir dire.

**Objections to Evidence and Testimony**

Hollis's third argument regarding ineffective assistance is that there were "nine occasions when defense counsel should have objected to inadmissible evidence or evidence whose prejudicial effect far outweighed any probative value." Generally, to show ineffective assistance of counsel for the failure to object during trial, the applicant must show that the trial judge would have committed error in overruling the objection. *Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004). Thus, if the evidence complained of is admissible, then the appellant cannot show that his counsel was ineffective in failing to object to it. *See Lee v. State*, 29 S.W.3d 570, 577-78 (Tex. App.—Dallas 2000, no pet.); *Cooper v. State*, 707 S.W.2d 686, 689 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd). Even if the evidence could be excluded on some basis, counsel may have sound strategy in not objecting if the evidence does not harm the appellant's case. *See Stafford v. State*, 813 S.W.2d 503, 508 (Tex. Crim. App. 1991). Finally, even if the

23

evidence is inadmissible and prejudicial, counsel's failure to object will not result in a reversal of the appellant's conviction unless the appellant demonstrates that the outcome of his trial would have been different had the evidence not been admitted. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (Texas Rule of Appellate Procedure 44.2(b) instructs that we must disregard "a nonconstitutional error 'that does not affect substantial rights.' . . . [S]ubstantial rights are not affected by the erroneous admission of evidence 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'"); *Bigley v. State*, 831 S.W.2d 409, 413 (Tex. App.—Austin 1992), *aff'd*, 862 S.W.2d 26 (Tex. Crim. App. 1993) ("Where there is not a reasonable possibility that improperly admitted evidence has contributed to an defendant's conviction, reversal is not required.").

### *Error One*

Hollis first complains that his counsel should have objected when, in response to the question "What about . . . people typically associated with methamphetamine, with the clandestine labs, are they of concern to police officers?," Officer McCrea answered, "Yes" because "they will take the methamphetamine a lot of time and they are just dangerous. That's all there is to it." Hollis claims this testimony necessitated an objection because it was "outrageous" testimony with "no probative value" from which it could be improperly inferred that Hollis was "a methamphetamine user and therefore dangerous." Hollis cites no authority in support of this claim. Nevertheless, by the language used in his argument, we consider his claim to be based on Texas Rules of Evidence 402 and 403. *See* Tex. R. Evid. 402, 403.

24

To be admissible, evidence must be relevant. Tex. R. Evid. 402. Even if relevant, however, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. The "probativeness" of a piece of evidence depends on "how compellingly the evidence serves to make a fact of consequence more or less probable." *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005).

McCrea's testimony that people associated with meth labs are often "dangerous" does not completely lack probative value as claimed by Hollis because it provided support for the reasonableness of the officers' protective sweep and initial detention of the suspects. Moreover, this probative value was not substantially outweighed by any danger that the jurors would infer that Hollis was dangerous because "dangerousness" was not an element of the crimes charged, and any affect it had on the jury's opinion was slight. Thus, Hollis did not receive ineffective assistance based on his counsel's failure to object to this testimony because the court would not have committed error in overruling the objection, *see Ex parte White*, 160 S.W.3d at 53, and because there is not a reasonable probability that this testimony contributed to Hollis's conviction, *see Solomon*, 49 S.W.3d at 365.

### Error Two

Hollis next complains about his counsel's failure to object when McCrea testified—in response to being asked, "Based on your observations of what was in that building as well as the odors coming from that building, after you made entry and found the individuals in there and

25

observed the things that you observed, what conclusions did you form about what was going on in that building?"—that "They were cooking methamphetamine . . . or were in the process of it." Hollis claims that his counsel should have objected on the basis of Rule 701 that this opinion was not helpful to the jury because any rational person could draw this conclusion. *See* Tex. R. Evid. 701.

Rule 701 covers the testimony of a "traditional" witness—one who personally witnessed or participated in the events about which he is testifying. *Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006). Rule 701 provides that such a "witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Tex. R. Evid. 701; *see Ex parte White*, 160 S.W.3d at 53. The fact that a rational person could reach the opinion testified about from the facts in evidence does not make the opinion unhelpful to the jury, as Hollis claims. In fact, Rule 701 expressly requires that the opinion must be reasonably capable of being formed based on the underlying events. *Fairow v. State*, 943 S.W.2d 895, 900 (Tex. Crim. App. 1997).

Here, McCrea testified about his training and experience in narcotics investigations and provided a detailed background of the events he witnessed in this case. He then testified that these personal observations led him to the conclusion that Hollis, Oxford, and Robeson were manufacturing methamphetamine. Hollis had not admitted to this, Oxford and Robeson did not testify, and none of the jurors had witnessed the events through the eyes of a trained officer. Thus, McCrea's opinion was helpful to the jury's determination of a fact issue. *See* Tex. R. Evid. 701.

26

Hollis relies on *Woods v. State*, 13 S.W.3d 100 (Tex. App.—Texarkana 2000, pet. ref'd), for his assertion that counsel should have objected that McCrea's opinion was not helpful to the jury. In *Woods*, our sister court determined that the testimony offered by three witnesses was unhelpful to the jury. *Id*. at 104. But in *Woods*, unlike here, the challenged testimony was drawn from evidence that was viewed equally and simultaneously by the testifying witnesses and the jurors: the surveillance video, which included a thirty-second shot of the criminal actor, was shown in court. *Id*. at 103. The three witnesses, none of whom had personally observed the crime, were then permitted to testify that, based on their viewing of the video, the actor shown committing the crime was the defendant. *Id*. Because the jurors were in an equal position to identify the defendant based on viewing the video, the three witnesses' testimony was not helpful. *Id*. at 104. *Woods* recognized, however, that other identification testimony was "helpful" because it was based on observations outside of the jurors' view: identification testimony given by the defendant's parole officer and by a witness who had observed the defendant at the crime scene was admissible because it "added something of relevance." *Id*. Here, McCrea's testimony is akin to that of the parole officer and personal-observation witness in *Woods* because his opinions were based on events that he had personally observed and that the jurors had not.

Because McCrea's opinion testimony was admissible under Rule 701, Hollis's counsel was not ineffective for failing to object to it. *See Ex parte White*, 160 S.W.3d at 53.

### Error Three

Third, Hollis complains about his counsel's failure to object when Officer Luciano was asked, "who do you expect to find at the methamphetamine lab?" and he answered "It's some

27

place that they want to keep insulated. . . . So the only people that are really there are people that are involved in the production of methamphetamine." Hollis claims that this testimony was objectionable because it was a "generalized opinion" that did not help the jury determine a fact issue. Again, Hollis cites no authority in support of his claim, but from the language used, we infer that he is referring to Rule 701, as discussed above. *See* Tex. R. Evid. 701.

Like McCrea's testimony, Luciano's was based on his training, experience, and personal observations. After spending several years conducting narcotics investigations, Luciano could report to the jury that the people discovered inside a meth lab are generally involved in the manufacture of methamphetamine. This opinion was helpful to the jury in determining whether Hollis was "merely present" or was a criminally responsible party. The testimony, therefore, did not violate Rule 701, and Hollis has failed to demonstrate that his counsel was ineffective in not objecting to it. *See Ex parte White*, 160 S.W.3d at 53; *see also Strickland*, 466 U.S. at 694.

### *Error Four*

Fourth, Hollis complains of his counsel's failure to object to the admission of State's exhibit 45, Hollis's mug shot taken on the night of the arrest. Hollis claims that his due process rights were violated because the jury was permitted to see Hollis dressed in "jail clothing."

It is well established that a criminal defendant's rights to a fair trial and to be presumed innocent may be violated if he is forced to stand trial in jail clothing. *See Randle v. State*, 826 S.W.2d 943, 945 (Tex. Crim. App. 1992) (citing U.S. Const. Amend. XIV; Tex. Code Crim. Proc. Ann. art. 38.08 (West 2005)). The same violations do not necessarily arise,

28

however, from the admission of the defendant's mug shot, even if it depicts him in jail clothing. As our sister court explained,

> We are not prepared to go so far as to hold that the admission of a photograph, at least in this case, rises to the same level of constitutional infringement as the trying of an accused in his jail clothing. The continuous presence of an accused in jail clothing "speaks" against the accused much louder than does the admission of a single "mug shot."

*Ware v. State*, 628 S.W.2d 249, 251 (Tex. App.—Fort Worth 1982, pet. ref'd).

The typical concern in admitting a defendant's mug shot is whether it provides prejudicial evidence of an extraneous offense. Thus, if the mug shot was obtained from a prior offense rather than the present one, it is frequently inadmissible. *See Alexander v. State*, 88 S.W.3d 772, 780-81 (Tex. App.—Corpus Christi 2002, pet. ref'd) (mug shot from prior offense was inadmissible because it "had a substantial and injurious effect on the jury's verdict" by painting appellant "as someone who had been arrested at least twice before"); *Green v. State*, 899 S.W.2d 245, 249 (Tex. App.—San Antonio 1995, no pet.) (counsel was ineffective by failing to object to introduction of "prior mug shots which showed earlier arrests unconnected with this offense").

The photograph of Hollis, however, was taken immediately after his arrest in the present case. A defendant's mug shot taken at the time of his arrest for the offense being tried is admissible because its danger of introducing an extraneous offense is vitiated. *See Reyes v. State*, 579 S.W.2d 927, 928 (Tex. Crim. App. 1979) (contrasting admissibility of mug shot from current offense with inadmissibility of mug shot from previous offense); *Ware*, 628 S.W.2d at 251 (admission of mug shot from present offense is not prejudicial).

29

We also note that our review of the transcript and the mug shot reveals no other circumstances about the photograph's admission that would be prejudicial to Hollis. The photograph contains no markings whatsoever and is simply a picture of Hollis's chest, shoulders, and head; he is wearing overalls and there is a plain, cinder block wall behind him. Very little time was devoted to its presentation at trial. Rather, Luciano testified merely that exhibit 45 was "a picture of Sargent Hollis when he went to the jail that night. . . . [T]hat's a jumpsuit I think they put on them there at the jail."

Because Hollis's mug shot was admissible, the trial court would not have erred in overruling an objection to its admission. Therefore, Hollis's counsel did not provide ineffective assistance by failing to object to it. *See Ex parte White*, 160 S.W.3d at 53.

### Error Five

Next, in arguing that he received ineffective assistance of counsel, Hollis complains of his attorney's failure to object to testimony given by Luciano in connection with exhibits 46-49, photographs showing Hollis's burned and soiled hands. Luciano testified that:

> The reason we photograph hands is, when you handle these chemicals, when you mess with these things, you start getting all kinds of discoloration and blisters and what-have-you from the extreme temperatures associated with and the caustic materials of producing methamphetamine. So, you see, a lot of times, people—their hands—their hands are going to be all fouled up from—from dealing with these chemicals that are used in the production of methamphetamine.

Hollis claims that his counsel should have objected, challenged Luciano's qualifications to provide this "expert opinion," and sought to take Luciano on voir dire outside the presence of the jury.

30

Again, Hollis cites no authority to support his argument, but we interpret his complaint to be governed by Rule 701. *See* Tex. R. Evid. 701.

Under Rule 701, an officer may testify about opinions based on his personal training and first-hand experiences without being qualified as an expert under Rule 702. *See* Tex. R. Evid. 701-02. As explained by the court of criminal appeals:

> [A]s a general rule, observations which do not require significant expertise to interpret and which are not based on a scientific theory can be admitted as lay opinions if the requirements of Rule 701 are met. This is true even when the witness has experience or training. Additionally, even events not normally encountered by most people in everyday life do not necessarily require the testimony of an expert. The personal experience and knowledge of a lay witness may establish that he or she is capable, without qualification as an expert, of expressing an opinion on a subject outside the realm of common knowledge. It is only when the fact-finder may not fully understand the evidence or be able to determine the fact in issue without the assistance of someone with specialized knowledge that a witness must be qualified as an expert.

*Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002).

Luciano testified that he has been a narcotics officer since 1998, that he handles about 70 narcotics cases a year, and that the majority of his cases since 2001 have involved methamphetamine. This experience gave Luciano the capability to testify that manufacturing methamphetamine often causes blisters and discoloration on the manufacturers' hands. This observation did not require significant expertise to interpret, was not based on a scientific theory, and could be readily understood by the fact-finders. Therefore, it was not necessary to qualify Luciano under Rule 702 for him to provide this testimony, and, because the testimony was based

31

on his personal observations and was helpful to the jury, it was admissible under Rule 701. *See* Tex. R. Evid. 701-02; *Osbourn*, 92 S.W.3d at 537.

Consequently, Hollis's counsel had no basis on which to object to this testimony, take Luciano on voir dire under Rule 705, or otherwise challenge his qualifications to give this opinion. *See* Tex. R. Evid. 705. Thus, Hollis has failed to demonstrate how his counsel's performance in relation to this testimony was deficient. *See Mallett*, 65 S.W.3d at 63.

### Error Six

Hollis's sixth complaint regarding his counsel's failure to object arises from the testimony given by Luciano in connection with the photographs admitted of Oxford and Oxford's inner arm. Luciano testified that he believed Oxford was Hollis's nephew and that the appearance of track-marks on one's inner arm indicates the use of intravenous drugs.

First, Hollis urges that the testimony regarding his relation to Oxford was hearsay. Hollis, however, has no basis to complain about this testimony because he testified to the same fact when he took the stand. When asked about his relation to Oxford, Hollis testified, "He's my little nephew." *See Marshall v. State*, 2006 Tex. Crim. App. LEXIS 2444, at *30 (Tex. Crim. App. Dec. 20, 2006) ("any error in the admission of the complained-of evidence was harmless [because] . . . appellant brought out essentially the same evidence during his direct examination of [witness]") (citing *Leday v. State*, 983 S.W.2d 713, 716-18 (Tex. Crim. App. 1998)); *Liggins v. State*, 979 S.W.2d 56, 64 (Tex. App.—Waco 1998, pet. ref'd) (defendant cannot complain about admission of evidence when "other evidence of substantially the same facts" is admitted without objection) (citing *McGlothlin v. State*, 896 S.W.2d 183, 189 n.9 (Tex. Crim. App. 1995)).

Second, Hollis complains that Luciano's testimony about "intravenous drug use" created a negative impression of Hollis. Even if this testimony were objectionable on the basis of Rule 403, no harm resulted from counsel's failure to object because there is no reasonable probability that the evidence complained of (a brief response regarding the drug use of a third party) contributed to Hollis's conviction. *See* Tex. R. Evid. 403 (relevant evidence may be excluded if its probative value is substantially outweighed by unfair prejudice); *Clemons v. State*, 605 S.W.2d 567, 571 (Tex. Crim. App. 1980) (harmless error test); *Bigley*, 831 S.W.2d at 413 (same). Therefore, Hollis has failed to demonstrate any reversible error from his sixth allegation of ineffective assistance arising from counsel's failure to object. *See Solomon*, 49 S.W.3d at 365.

### *Error Seven*

The seventh objection that Hollis claims his counsel was ineffective in failing to make relates to the admission of Hollis's written statement. Hollis claims that, even if a motion to suppress the statement would have been unsuccessful, his counsel should have moved to redact the portion of the statement that "I took the rap for Tony Carvella on some dope that wasn't mine" because it refers to an extraneous offense.

Even if this sentence could be characterized as evidence of an extraneous offense that was inadmissible under Rule 404(b), its admission was harmless because there is no reasonable probability that it contributed to Hollis's conviction; this portion of the statement was vague to begin with, was not elaborated on or explained, and was never again mentioned before the jury. *See* Tex. R. Evid. 404(b) (evidence of other crimes, wrongs, or bad acts is inadmissible to prove character conformity but is admissible for other purposes such as motive, opportunity, intent,

33

preparation, plan, knowledge, identity, or absence of mistake or accident); *Solomon*, 49 S.W.3d at 365 (counsel's error is not reversible if, in all probability, it did not contribute to conviction). Also, it may have been a strategic decision by counsel not to object to this portion of the statement so as to not call any unwanted attention to it. But in the face of a silent record, we "will not conclude the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it." *Garcia*, 57 S.W.3d at 440. Here, the record does not establish that counsel's conduct in failing to object to or move to redact this portion of the statement was so outrageous that no competent attorney would have engaged in it. Thus, Hollis's seventh argument regarding ineffective assistance for failure to object is without merit.

### Error Eight

Hollis next complains about his counsel's failure to object when Luciano testified about an unrecorded, oral statement that Hollis made while in custody. Specifically, Luciano testified that, after Hollis had provided and signed his written statement, "We were visiting with him. . . . And at one point he said . . . his exact words were: 'I ain't going to be—I ain't going to be a snitch. I know what you want. You want Jimmy.' And I asked him if that was Jimmy Jackson and he agreed with me." Hollis claims that the admission of this testimony violates article 38.22 of the code of criminal procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3.

When a criminal suspect is placed in custody, law enforcement personnel must comply with certain procedural safeguards in order to protect the suspect's privilege against compulsory self-incrimination under the Fifth Amendment. *Rodriguez v. State*, 191 S.W.3d 428, 447 (Tex. App.—Corpus Christi 2006, pet. ref'd). Pursuant to these safeguards, before any

34

"custodial interrogation" occurs, the officers must provide the appropriate *Miranda* warnings. *See* 384 U.S. at 444. "Custodial interrogation" is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id*. If *Miranda* is not satisfied, then any resulting statement is tainted with constitutional error and will be inadmissible at trial. *State v. Waldrop*, 7 S.W.3d 836, 838 (Tex. App.—Austin 1999, no pet.).

Article 38.22 is an additional safeguard afforded to statements obtained during custodial interrogation. Tex. Code Crim. Proc. Ann. art. 38.22. Section 3 establishes admissibility requirements for "oral or sign language" statements made by the accused during a custodial interrogation, such as Hollis's comment about being a "snitch." According to section 3 (with narrow exceptions provided therein), such statements are inadmissible against the accused unless (1) the accused is given and waives his *Miranda* rights and (2) a clear and accurate electronic recording of the statement is made, unaltered, timely provided to defense counsel, and preserved through final judgment. *See id*. § 3. The protection of article 38.22, however, has no constitutional ramifications. *Nonn v. State*, 117 S.W.3d 874, 880 (Tex. Crim. App. 2003). Rather, it is a "procedural evidentiary" rule that "merely prescribes the various requirements that must be satisfied before a statement made by an accused as a result of custodial interrogation will be admitted against him/her at trial." *Id*. Thus, as long as *Miranda* is satisfied, the admission of a statement that does not comply with article 38.22 is a nonconstitutional error that will not result in a reversal of the judgment unless the record demonstrates that the erroneously admitted statement "had a substantial or injurious [e]ffect on the jury verdict." *Id*. at 881-82.

Here, it is undisputed that no electronic recording was made of Hollis's "snitch" comment. Nevertheless, it is also undisputed that before the interview began, the officers covered the *Miranda* warnings with Hollis, and he agreed to waive his rights and give a statement. Hollis does not challenge the validity of his waiver. Thus, the pertinent inquiry is whether there is a reasonable probability that the admission of this comment had an injurious effect on the verdict.[10]

In light of the substantial amount of properly admitted evidence connecting Hollis to the production and possession of methamphetamine or its precursors (including the abundance of photographs of materials found in the dance hall and the officers' explanatory testimony about the roles played by these materials in manufacturing methamphetamine, the appearance of Hollis's hands, his admission that he "took pills out there" as payment for "speed," and the officers' testimony about the strong odors emanating from the dance hall), we are convinced that Luciano's testimony (about Hollis saying that he did not want to be a snitch) did not contribute to Hollis's conviction. As a result, counsel's failure to object to testimony about the unrecorded, oral statement made by Hollis while in custody cannot be deemed ineffective assistance. *See Bigley*, 831 S.W.2d at 413.

---

[10] We recognize that, based on the circumstances presented here, one could argue that Hollis's "snitch" comment was admissible because he was not being "interrogated" at the time. *See Rodriguez v. State*, 939 S.W.2d 211, 215 (Tex. App.—Austin 1997, no pet.) (*Miranda* and article 38.22 apply only to statements made as a result of custodial interrogation). Nevertheless, because the record does not clearly reflect whether the interrogation had stopped or was continuing at the time of this comment and because the State does not advance this argument, we assume for purposes of this case that the protections afforded to statements made by an accused during custodial interrogation apply to Hollis's "snitch" comment.

*Error Nine*

Hollis's final ineffective assistance of counsel argument arises from testimony given by the State's expert chemist, Hambrick, who testified as follows:

Q: Based upon your understanding of the manufacturing process involved in manufacturing methamphetamine, at what stage in the manufacturing process was the liquid contained in State's exhibit number 3?

A: It was—I would think it was the meth oil that would be in the organic solvent and was ready to be salted out.

Q: And once that was salted out, what would you have?

A: You would have methamphetamine hydrochloride, which would be a powder.

Q: So—so that would be in mid-cook then, at that point?

A: Well, I guess you could call it "mid." It's—the reaction and everything is over. They have just extracted the meth out of the reaction product.

Hollis first claims that his counsel should have "challenged" this opinion by cross-examining him about whether the analysis performed "included a quantitative breakdown of reagent conversion." However, the decision of what to ask on cross-examination falls within the parameters of trial strategy. *See Miniel v. State*, 831 S.W.2d 310, 324 (Tex. Crim. App. 1992). Trial strategy will be reviewed only if the record demonstrates that the action taken by trial counsel is without any plausible basis. *Ex parte Ewing*, 570 S.W.2d 941, 943 (Tex. Crim. App. 1978); *Ortiz v. State*, 866 S.W.2d 312, 315 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd). The record here is silent as to counsel's strategy regarding the cross-examination of Hambrick, and we will not speculate as to his tactics. *Bone*, 77 S.W.3d at 833. Because the record does not contain counsel's reason for not

37

asking further questions of Hambrick, Hollis has failed to show that his counsel performed deficiently in failing to further cross-examine Hambrick and has failed to show that, even had his counsel had asked more questions on cross-examination, the result of his trial would have been different. *See Davis*, 119 S.W.3d at 370.

Second, Hollis claims his counsel should have challenged Hambrick's qualifications to testify that the substances found in the dance hall were in "mid-cook." Notably, Hollis concedes that Hambrick was "qualified as an expert in the area of drug analysis" and recounts the various facets of Hambrick's ample training and experience. Hollis does not explain why Hambrick would not be qualified to give the above testimony, does not cite any authority to support his claim, does not offer what questions his counsel should have asked on voir dire, and does not allege that there is any likelihood such a challenge would have been successful. The record is silent as to why Hollis's counsel did not request permission to take Hambrick on voir dire. To find that his counsel's performance was deficient based on this alleged error would call for speculation, which we will not do. *See Jackson*, 877 S.W.2d at 771.

**CONCLUSION**

Hollis urges that, even if no single error demonstrates ineffective assistance, when considered cumulatively, these errors show that Hollis's counsel was ineffective. We disagree. Considering the totality of the representation based on the record before us and considering the strict standards for determining that counsel's performance was ineffective, we cannot say that any of Hollis's assertions, individually or combined, overcomes the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S.

at 206.  Hollis has, therefore, failed to satisfy the first prong of *Strickland*.  *See id*.  In any event, Hollis has also failed to satisfy the second prong of *Strickland* because he cannot demonstrate that his counsel's alleged deficiencies prejudiced the case, deprived him of a fair trial, or produced an unreliable result.  *See id*.; *Ex parte Cash*, 178 S.W.3d at 818.  We overrule Hollis's single issue and affirm the judgment in all respects.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   February 16, 2007

Publish

39