ACCEPTED
03-14-00695-CR
7177394
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/30/2015 10:38:34 PM
JEFFREY D. KYLE
CLERK

**No. 03-14-00695-CR**

_____

**IN THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/30/2015 10:38:34 PM
JEFFREY D. KYLE
Clerk

_____

PAUL DANIEL CAMPBELL, Appellant

v.

THE STATE OF TEXAS, Appellee

_____

On Appeal from the 274th Judicial District Court of Comal County, Texas
Cause No. CR2013-512
Honorable Gary L. Steel, District Judge Presiding

_____

**BRIEF FOR THE STATE**

_____

**Jennifer Tharp**
**Criminal District Attorney**

**By**
**Joshua D. Presley**
**SBN: 24088254**
**Assistant District Attorney**
**150 N. Seguin Avenue, Suite #307**
**(830) 221-1300**
**Fax (830) 608-2008**
**New Braunfels, Texas 78130**
**E-mail: preslj@co.comal.tx.us**
**Attorney for the State**

**Oral Argument Is Requested**

i

## Identity of Parties and Counsel

### Attorneys for the Appellant Paul Daniel Campbell

**AT TRIAL**
Paul Finley
Reagan Burrus PLLC
401 Main Plaza, Suite 200
New Braunfels, TX 78130
Tel: (830) 625-8026

**ON APPEAL**
Amanda Erwin
The Erwin Law Firm, L.L.P.
109 East Hopkins Street, Suite 200
San Marcos, TX 78666
Tel: (512) 938-1800

### Attorneys for the Appellee, The State of Texas

**AT TRIAL**
Chari L. Kelly & Daniel Palmitier
Assistant District Attorney
COMAL COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
Telephone: (830) 221-1300
Facsimile: (830) 608-2008
Email:      kellyc@co.comal.tx.us
              palmid@co.comal.tx.us

**ON APPEAL**
Joshua D. Presley - SBN# 24088254
Assistant District Attorney
COMAL COUNTY CRIMINAL DISTRICT ATTORNEY'S OFFICE
150 N. Seguin Avenue, Suite 307
New Braunfels, Texas 78130
Telephone: (830) 221-1300
Facsimile: (830) 608-2008
Email:      preslj@co.comal.tx.us

# Table of Contents

Index of Authorities ..........................................................................................................v

Issues Presented ...............................................................................................................1

Statement of Facts............................................................................................................2

*Ineffective Assistance of Counsel Standard of Review on Appeal* ...................10

**Appellant's Trial Counsel Was Not Ineffective for Not Objecting to Voir Dire Questions**...........................................................................................14

*Summary of the Argument* ..................................................................................14

A. The Interrogatories by the State Were Not Improper Commitment Questions .......................................................................................................14

B. Even if the Questions Would Have Otherwise Been Improper, Trial Counsel Had a Legitimate Strategic Reason Not to Object to the Questions .......................................................................................................19

C. Appellant Has Not and Cannot Show There Is a Reasonable Likelihood the Result of the Proceeding Would Have Been Different if Not for Trial Counsel's Alleged Deficiency.....................................................24

**Trial Counsel Was Not Ineffective for Not Objecting to the State's Closing Argument**........................................................................................27

*Summary of the Argument* ..................................................................................27

A. The State's Closing Argument Was Not Improper........................27

B. Because of His Own Remarks and the Egregious Facts of His Case, Appellant Cannot Establish Prejudice in Any Event ...........................30

**Trial Counsel Was Not Ineffective for Allegedly Not Testing Appellant's Blood** ..............................................................................................................31

*Summary of the Argument* ..................................................................................31

iii

*Argument* ............................................................................................32

Prayer ...................................................................................................34

Certificate of Service ...........................................................................35

Certificate of Compliance .....................................................................35

iv

# Index of Authorities

## Statutes, Rules & Secondary Sources

Tex. Crim. Proc. Code Ann. art. 35.16
(a)(9)(West, Westlaw through 2015 R.S.) ...........................................................17

Tex. Crim. Proc. Code Ann. art. 35.16
(b)(3)(West, Westlaw through 2015 R.S.) ...........................................................17

## Cases

*Abron v. State*, 523 S.W.2d 405 (Tex.
Crim. App. 1975) ...............................................................................................18

*Alvarez v. State*, 13-13-00207-CR, 2014
WL 585837 (Tex. App.—Corpus Christi
Feb. 13, 2014) (not designated for
publication), *petition for discretionary
review refused* (Aug. 20, 2014)........................................................................18

*Barajas v. State*, 93 S.W.3d 36 (Tex.
Crim. App. 2002) ...............................................................................................17

*Cannon v. State*, 668 S.W.2d 401 (Tex.
Crim. App. 1984) ...............................................................................................12

*Cardenas v. State*, 325 S.W.3d 179 (Tex.
Crim. App. 2010) ...............................................................................................17

*Davis v. State*, 349 S.W.3d 517 (Tex.
Crim. App. 2011) ....................................................................14, 15, 16, 20

*Delrio v. State*, 840 S.W.2d 443, 447
(Tex. Crim. App. 1992)..........................................................................20, 24, 30

*Ex parte Martinez*, 195 S.W.3d 713 (Tex.
Crim. App. 2006) ...............................................................................................32

*Ex parte Torres*, 943 S.W.2d 469 (Tex. Crim. App. 1997) ...................................................................................13

*Flowers v. State*, 133 S.W.3d 853 (Tex. App.—Beaumont 2004, no pet.) ...................................................29

*Gamble v. State*, 916 S.W.2d 92 (Tex. App.—Houston [1st Dist.] 1996, no pet.) ...........................................13, 23

*Garcia v. State*, 57 S.W.3d 436 (Tex. Crim. App. 2001) ...................................................................................11

*Goodspeed v. State*, 187 S.W.3d 390 (Tex. Crim. App. 2005) ...........................................................................13, 22

*Harris v. State*, 784 S.W.2d 5 (Tex. Crim. App. 1989) ...................................................................................29

*Hernandez v. State*, 508 S.W.2d 853 (Tex. Crim. App. 1974) ...........................................................................18

*Hernandez v. State*, 563 S.W.2d 947 (Tex. Crim. App. 1978) ...........................................................................18

*Hollis v. State*, 219 S.W.3d 446 (Tex. App.—Austin 2007, no pet.) ..............................................................12

*In re R.J.R.*, 281 S.W.3d 43 (Tex. App. —El Paso 2005, no pet.) ...................................................................30

*Jackson v. State*, 877 S.W.2d 768 (Tex. Crim. App. 1994) ...................................................................................12

*Lopez v. State*, 343 S.W.3d 137 (Tex. Crim. App. 2011) ...................................................................................10, 11

*Mallett v. State,* 65 S.W.3d 59 (Tex. Crim. App. 2001) ...................................................................................12

*Mata v. State*, 226 S.W.3d 425 (Tex.
Crim. App. 2007) ...............................................................................11, 13

*Mayhue v. State*, 969 S.W.2d 503 (Tex.
App.—Austin 1998, no pet.)..............................................................12

*Menefield v. State,* 363 S.W.3d 591
(Tex. Crim. App. 2012)......................................................................10

*Patrick v. State*, 906 S.W.2d 481 (Tex.
Crim. App. 1995) ...............................................................................11

*Perez v. State,* 310 S.W.3d 890 (Tex.
Crim. App. 2010) ...............................................................................11

*Prystash v. State*, 3 S.W.3d 522 (Tex.
Crim. App. 1999) ...............................................................................30

*Robinson v. State*, 03-14-00407-CR,
2015 WL 4515128 (Tex. App.—
Austin July 22, 2015) (not designated
for publication), *petition for
discretionary review filed* (Aug. 27,
2015) ..................................................................................................32, 33

*Rylander v. State*, 101 S.W.3d 107 (Tex.
Crim. App. 2003) ...............................................................................13

*Sanchez v. State*, 165 S.W.3d 707 (Tex.
Crim. App. 2005) ...............................................................................18, 25

*Sanchez v. State*, 04-02-00624-CR, 2006
WL 1623311 (Tex. App.—San Antonio
June 14, 2006, pet. ref'd) (not designated
for publication)...................................................................................25

*Sells v. State*, 121 S.W.3d 748 (Tex.
Crim. App. 2003) ...............................................................................16

*Strickland v. Washington*, 466 U.S. 668 (1984) ....................................................................10, 11, 22, 23, 24

*Thompson v. State,* 9 S.W.3d 808 (Tex. Crim. App. 1999) ...............................................................................11, 23

*Tong v. State,* 25 S.W.3d 707 (Tex. Crim. App. 2000) ........................................................................................12

*Vrba v. State*, 151 S.W.3d 676 (Tex. App.—Waco 2004, pet. ref'd) ..............................................................16

## Issues Presented

1. Is defense counsel ineffective for not objecting to the State's questions on voir dire when said questions merely uncover jurors' preexisting views and the Appellant planned to elicit the same information for the effective exercise of his peremptory strikes?

2. Is defense counsel ineffective for not objecting to the State's correct statement of the law that the jury may not consider how parole might be applied to the Defendant after the Defendant has already asked the jury to consider how a deadly weapon finding will preclude parole in his case – before at least half his time is served – in an attempt to procure a shorter sentence?

3. Can defense counsel be found ineffective on appeal based on an Appellant's allegation that he did not further test Appellant's blood for THC – which the Appellant speculates would have been absent – when trial counsel's motivations are not in the record and Appellant admitted at trial to intoxicated, outrageously reckless driving which caused the gruesome death of a vibrant wife and mother?

On April 1, 2013, 54-year-old Alta Inez "Sissy" Payne was driving her Ford Explorer home from her job at "Goin' Postal" (III R.R. at 101; VI R.R. at 64). Both of Sissy's daughters had obtained degrees – Leslie from Howard Payne, and more recently, her daughter Amy from Texas A&M – and Sissy had taken the job to help pay school bills and save for other plans she had with her husband (III R.R. at 100; VI R.R. at 58 (State's Ex. 68), 56 (State's Ex. 67), 81 (State's Ex. 77)). Sissy had been a stay-at-home mom for much of her life, and she was excited to have a new job at the mail-related service (III R.R. at 87, 92). Sissy's family had noticed the recent change her new occupation had brought about; she appeared to be vibrant, more like her old self (*id.* at 86-87).

Sissy – a nickname given to her as an infant by her then two-year-old brother – had been her mother's first daughter (*id.* at 91). Her mother, Mary Ragland, described her as a sweet baby and a good child (*id.*). Sissy had problems with Crohn's disease when she was in her teens (*id.*). She almost died on more than one occasion (*id.*). Eventually she had to have her intestines removed (*id.* at 92).

Around that time Sissy met Lonnie Payne, her brother's roommate (*id.* at 92). When Sissy was very sick, Lonnie would come over from Houston on the weekends; he would "sit by her bed … and just loved her to death" (*id.*). After seeing how Lonnie was with Sissy through her illness, Sissy's family was thrilled

when Lonnie and Sissy decided to get married (*id*.). Lonnie and Sissy would later have two daughters, and the four of them were happy and inseparable (*id*.).

Sissy was also close to her extended family (*id*. at 94-95; VI R.R. at 74 (State's Ex. 74)). She bring would bring the family together by planning activities, camping and spending weekends on the lake (III R.R. at 82). Sissy crafted an origami "flower" arrangement out of money for a cousin's wedding, helped a close friend set up her dress-design shop, and made costumes for Halloween (*id*. at 95-96; VI R.R. at 79 (State's Ex. 76).

When Sissy's mother developed lung cancer, Sissy stayed by her side and helped her through it (III R.R. at 97). Sissy's mother said that it was around this time that Sissy became the matriarch of the family – or "Monarch," as Sissy's daughter would refer to her (*id*.). Sissy was the "glue" that kept things together, the mediator of the family, and she raised her daughters to be helpful and considerate (*id*. at 99, 87, 100).

Sissy's 24-year-old daughter Amy said her mother was selfless, like a best friend (*id*. at 84). Amy would call Sissy every day after work and talk with her for anywhere from 20 minutes to two hours (*id*. at 85-86). Amy was with her mother during Easter, March 31, 2013 (*id*. at 86). Amy stayed late that night because she was having a good weekend with her family (*id*. at 87). Sissy worried about her daughter driving home late at night (*id*.). She told her daughter to "[s]tay far away

from the other guy" while driving home (*id.*). The next day on April 1st, while Sissy was going home from her new job, Paul Campbell – Appellant – was driving in the opposite direction (*id.* at 26-27).

Appellant – an out-of-work bull rider – was driving a gray Ford Ranger pickup truck (IV R.R. at 24, 32-33; III R.R. at 26). He had been placed on probation on August 12, 2011 for possession of marijuana and resisting arrest (III R.R. at 77). However, after he subsequently picked up another possession of marijuana charge in Kendall County, his probation had been revoked and he served 30 days in jail for both cases (*id.* at 78). On April 1, 2013, after having at least two 20-ounce glasses of wine "on an empty stomach," Appellant also had a full wine bottle and a marijuana pipe with him in the Ranger as he drove down FM 306 (IV R.R. at 63, 65).

Justin Nauert, a firefighter, was doing an exterior survey of a building alongside FM 306 that day (III R.R. at 25-26). While he was working, he observed Appellant's gray Ford Ranger leave the roadway – hitting the gravel parking lot Nauert was working in – to pass by on the right side of an Econoline van (*id.* at 26). Appellant regained control and returned to the roadway after passing the van (*id.*). Although that stretch of road had a posted speed limit of 55 miles per hour, Nauert estimated Appellant was speeding by at 70 to 75 (*id.* at 26). Nauert turned

4

to his fellow crew members and remarked that Appellant could have an accident driving like that (*id*. at 27).

Charles Hutson was driving his F-350 truck on FM 306 further on ahead of Appellant (*id*. at 34). It was almost 4:00 p.m., and Hutson was headed to his children's middle school to pick them up (*id*.). At that point in FM 306, the road only had one lane in either direction, and there was no passing lane (*id*. at 35). Hutson crossed a bridge and was negotiating a curved portion of the road in a no-passing zone (*id*. at 35-36, 50). The first time Hutson noticed anything amiss was when he heard a noise and saw "just a blur" as Appellant's Ranger sped by him on the right (*id*. at 35-36). Hutson did not know how Appellant had managed to pass him on the right-hand side, since there was no room on the shoulder to pass there (*id*. at 36). While the speed limit on that part of FM 306 was 45, Hutson estimated Appellant was travelling at 80 miles an hour (*id*. at 36-37).

Appellant then cut back in front of Hutson (*id*. at 37). Appellant was so close that Hutson thought he had clipped Hutson's front brush guard (*id*.). Appellant's Ranger pickup turned slightly sideways "like he had lost control" and shot straight across the lane into oncoming traffic (*id*.). Hutson saw kids in a van which Appellant narrowly missed (*id*.). Appellant's Ranger pickup then slammed into Sissy Payne's Ford Explorer just behind her driver's side front tire (*id*. at 37, 26). Hutson "was right there beside him and it just exploded" (*id*. at 37).

5

Oil covered Hutson's windshield and "[e]verything went black" (*id.*). Appellant's Ranger collided with another vehicle, a Toyota Tundra pickup (*id.* at 30). The Tundra contained a man with his pregnant 24-year-old wife and three-year-old child (*id.* at 30, 52). The impact of Appellant's subsequent collision with the Tundra forced the three-year-old's knee into his own eye, leaving the child with an eye injury (*id.* at 52; V R.R. at 34 (State's Ex. 16)). Appellant's Ranger split into three large pieces (III R.R. at 28). Appellant's cab landed in a tree around 75 to 100 feet away from his chassis, while the engine block was 25 to 50 feet away (*id.* at 27-28; V R.R. at 6 (State's Ex. 2), 10 (State's Ex. 4), 24 (State's Ex. 5)). A school bus was only three vehicles behind Sissy's Ford Explorer (III R.R. at 39).

There was fire from burning oil on Hutson's hood (*id.* at 37). Hutson managed to pull over and got out of his truck to see if he could help (*id.*). Appellant's Ranger had gone "through" Sissy's Explorer, and there was "just nothing left of it" (*id.* at 38; V R.R. at 26 (State's Ex. 12)). Nauert, the firefighter who had observed Appellant's dangerous driving only minutes earlier, responded to the report of a head-on collision involving multiple vehicles (III R.R. at 27). Debris was strewn around the crash site; some of it had apparently damaged an adjacent hurricane fence (VI R.R. at 42 (State's Ex. 60)). Nauert saw the three

6

heavily damaged vehicles and went to check on the woman in the Explorer (III R.R. at 27-28).

Nauert found Sissy "pinned inside of the vehicle and mangled" (*id*. at 28; V R.R. at 46 (State's Ex. 22), 52 (State's Ex. 25)). She had blunt force trauma "from the head to the toes" (III R.R. at 71). Her brainstem had been almost completely transected (*id*.). Sissy's chest had been crushed on both sides – injuring her lungs – and she had bled into each chest cavity (*id*. at 72). She had numerous fractures and her heart had ruptured open (*id*.). Nauert found no pulse, and she was pronounced dead on the scene (*id*. at 28). Trooper Jason Nolen had extensive experience with crash investigations (*id*. at 40). He was "astonished" to see the Ranger split in three pieces, and was also surprised the numerous safety devices – including a seat belt and front and side-curtain airbags – were not enough to save Sissy, observing that "nothing could save her with the impact that was … forced upon her" (*id*. at 44).

Nauert went to check on Appellant (*id*. at 29). Appellant and his cab smelled "pretty heavily" of alcohol (*id*.). Officers found the wine bottle and the glass marijuana pipe near Appellant's car (*id*. at 57). Blood test results indicated Appellant had a blood-alcohol concentration of .132, over the legal limit (*id*. at 61). Trooper Nolen was tasked with notifying Lonnie Payne about Sissy's death (*id*. at 64).

7

Sissy's husband of 30 years had gotten off of work early that day (*id.* at 101). He called and left a message with his wife to surprise her with the news that he would be home early (*id.*). When he reached home she had not arrived (*id.*). He turned on the news and changed his clothes (*id.*). When he heard a report of a fatality accident, he looked and saw their Ford Explorer on the television (*id.*). His neighbor came over and they began calling hospitals trying to find Sissy (*id.*). Nolen arrived at Lonnie's house, noting that "the look on his face was the worst part. To tell a man that's been married to a woman for – I think he said 30 years – that his wife had just passed was the worst part" (*id.* at 65).

Sissy's brother had passed away three months earlier (*id.* at 97). Sissy's mother testified that when she received the call, she recalled saying "[i]t can't be Sissy. It can't be Sissy because we just lost Joe. But it was Sissy" (*id.* at 97-98). Sissy's daughter Amy testified that "one of the first thoughts as soon as I heard it happened was that she's not going to be there to meet her grandkids and to see me get married" (*id.* at 86). Amy pointed out her fiancé during her testimony on October 14, 2014; at the time of the trial, Amy had been engaged for a month (*id.* at 85). Sissy's family members said that a part of their lives would always be missing (*id.* at 86, 97, 99).

Lonnie testified that since his wife's death "it's hard to go home …. People don't like coming to our house much. I've kind of had to take away some of the

8

memorable things. It's hard to drive down that road. It's – it's a lot different. It is something that, you know, you don't expect when it happens. And it's just your life is empty kind of" (*id*. at 102). Lonnie said he would wrestle with forgiving Appellant for the rest of his life. Lonnie added that "I don't believe that our court is for forgiveness. I believe our court is for justice. I don't believe [Appellant] learned that lesson yet from his previous arrests. [Appellant has] the rest of his life to have his family, see his kids be married, and see grandkids. We won't have Sissy for that. That's how I feel about it" (*id*. at 103).

Appellant took the stand for the punishment hearing, having pled "guilty" to the offense and "true" to the deadly weapon issue (*id*. at 19). Appellant said that he had head injuries since kindergarten and that he was worried about his future after reading NFL studies on concussions (IV R.R. at 28-31). Several defense witnesses testified that Appellant was a "changed" man since the wreck that killed Sissy (*id*. at 9, 17-18). However, Appellant admitted that he drank and smoked marijuana even after the wreck – despite the terms of his release on bond:

> **State**: So even after taking someone's life, being released from jail, being told you're not to smoke marijuana or drink alcohol, you continued to do it?
>
> **Appellant**: Yes, sir.

(*id*. at 49). On the stand, Appellant would not acknowledge that smoking marijuana was a problem (*id*. at 50).

The range of punishment was from two to 20 years in prison and up to a $10,000 fine (*id*. at 74). The jury was also asked to determine whether it believed Appellant should be placed on probation, if it believed he was eligible (*id*. at 74-75). The jury returned a verdict of 17 years in the Texas Department of Criminal Justice and a fine of $5,000, which the trial court immediately imposed (*id*. at 101).

## *Ineffective Assistance of Counsel Standard of Review on Appeal*

The Sixth Amendment right to effective assistance of counsel does not provide a right to errorless counsel; it is a right to objectively reasonable representation. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011); *citing McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970); *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, an appellant must satisfy both prongs of *Strickland*, demonstrating both deficient performance by counsel as well as prejudice suffered by the defendant because of counsel's alleged deficient performance. 466 U.S. at 687; *Menefield v. State,* 363 S.W.3d 591, 592 (Tex. Crim. App. 2012).

Under the first prong, the Applicant must demonstrate that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687–88. To satisfy the second prong of *Strickland*, the Applicant has to show the existence of a reasonable probability –

10

one sufficient to undermine confidence in the outcome – that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694. Failure to make the required showing of either deficient performance *or* sufficient prejudice defeats the ineffectiveness claim. *Strickland,* 466 U.S. at 700; *see Perez v. State,* 310 S.W.3d 890, 893 (Tex. Crim. App. 2010).

"It is not sufficient that the appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence." *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007). In making its assessment of counsel's assistance, the reviewing court examines the totality of the representation and the circumstances of each case without the benefit of hindsight. *Lopez,* 343 S.W.3d at 142-43; *Thompson v. State,* 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *Garcia v. State*, 57 S.W.3d 436, 430 (Tex. Crim. App. 2001). The reviewing court must presume that counsel is better positioned to judge the pragmatism of the particular case, and that he "made all significant decisions in the exercise of reasonable professional judgment." *Delrio v. State*, 840 S.W.2d 443, 447 (Tex. Crim. App. 1992) (citing *Strickland v. Washington*, 466 U.S. at 690).

Reviewing courts will indulge in a strong presumption that trial counsel's performance was reasonable. *Patrick v. State*, 906 S.W.2d 481, 495 (Tex. Crim.

App. 1995). The "[a]ppellant has the burden of proving ineffective assistance by a preponderance of the evidence." *Id.* (citing *Cannon v. State*, 668 S.W.2d 401 (Tex. Crim. App. 1984)). The Court has also noted that "the presumption that trial counsel's performance was reasonably based in sound trial strategy, coupled with the absence of any supporting evidence in the record of unreasonableness, compels a reviewing court to consider ways in which trial counsel's actions were within the bounds of professional norms." *Mata v. State*, 226 S.W.3d at 431.

To prevail on a claim of ineffective assistance of counsel, an appellant must provide a record that affirmatively demonstrates that defense counsel's performance was not based on sound strategy. *Mallett v. State,* 65 S.W.3d 59, 63 (Tex. Crim. App. 2001); *Hollis v. State*, 219 S.W.3d 446, 456 (Tex. App.—Austin 2007, no pet.); *Mayhue v. State*, 969 S.W.2d 503, 511 (Tex. App.—Austin 1998, no pet.). If the appellate record is silent regarding the reasons for defense counsel's conduct, then it is insufficient to overcome the strong presumption that counsel was following a legitimate strategy. *Tong v. State,* 25 S.W.3d 707, 714 (Tex. Crim. App. 2000); *Thompson v. State,* 9 S.W.3d at 813–14; *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (refusing to hold counsel's performance deficient given the absence of evidence concerning counsel's reasons for choosing the course he did); *Hollis v. State*, 219 S.W.3d at 456

As the Court stated in *Ex parte Torres,* "[i]n most instances, the record on direct appeal is inadequate to develop an ineffective assistance claim." 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (internal citations omitted). Courts will not speculate to find trial counsel's strategies ineffective. *Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.). The Court has noted that "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective. Absent such an opportunity, an appellate court should not find deficient performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (quoting *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003)).

Accordingly, the Court has repeatedly held that post-conviction writs of habeas corpus are the more appropriate or preferable means of raising a claim of ineffective assistance of counsel. *See, e.g., Rylander*, 101 S.W.3d at 110-11; *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998); *Mata*, 226 S.W.3d at 430 ("[t]he lack of a clear record usually will prevent the appellant from meeting the first part of the *Strickland* test, as the reasonableness of counsel's choices and motivations during trial can be proven deficient only through facts that do not normally appear in the appellate record").

## Appellant's Trial Counsel Was Not Ineffective for Not Objecting to Voir Dire Questions

### *Summary of the Argument*

Although Appellant claims his counsel was ineffective for failing to object to what he categorizes as impermissible commitment questions, the State's questions were not improper. Additionally, even if the State's questions had been improper, Appellant's trial counsel explicitly stated at the outset of his voir dire that he wanted to know the information elicited by the State; the fact that each of the venire members who Appellant struck gave answers which appeared to be unfavorable to him during the State's voir dire demonstrates a reasonable strategic justification for not objecting. Finally, even if Appellant could show his counsel's performance had been deficient, given the egregious facts of his case, he cannot show a reasonable probability the result of the proceeding would have been different absent the allegedly objectionable questions by the State during voir dire.

### A. The Interrogatories by the State Were Not Improper Commitment Questions.

Appellant first complains of the State's question related to the goal of sentencing. Brief for Appellant at 14. However, the parties in a criminal case are given broad latitude to ask general background and philosophy questions of the venire members. *Davis v. State*, 349 S.W.3d 517, 518 (Tex. Crim. App. 2011). As

the Court in *Davis* observed, such questions might include inquiries "into a prospective juror's general philosophical outlook on the justice system (such as whether the retribution, deterrence, or rehabilitation is the prime goal of the criminal justice system)." *Id*.

In *Davis*, the Court found that the Court of Appeals had erred in upholding the trial court's decision to prevent defense counsel from asking the question "[l]et's talk about factors in [assessing] the sentence in a case of aggravated robbery with a deadly weapon, what factors do y'all think are important?" *Id*. at 518, 519. The Court in *Davis* reversed the Court of Appeals' decision that defense counsel's question was an improper commitment question. *Id*. at 519. Rather, the question "sought to discover which factors would be important to jurors' decisions, without inquiring how those factors would influence the decision." *Id*.

In the instant case, the State asked whether the "main purpose of sentencing" was rehabilitation, restitution, deterrence, or punishment (II R.R. at 75-76). Although Appellant tries to cite *Standefer* for his contention that the State's interrogatory was an improper commitment question (Brief for Appellant at 13-14), *Davis* distinguished questions such as this from *Standefer*. *See Davis,* 249 S.W.3d at 519. Just as in *Davis*, the State's question in Appellant's case did not ask jurors how particular facts would influence their decisions. *See id*. It merely sought to discover what factors would be important to their decision. *See id*. Because the

State only inquired into the "prospective juror's general philosophical outlook on the justice system (such as whether the retribution, deterrence, or rehabilitation is the prime goal of the criminal justice system)," it did not ask an impermissible commitment question. Additionally, just as in *Davis*, in Appellant's case the jurors' sentencing decision is *not* a binary "yes or no" response; instead, the range included probation or a wide range of confinement. *See id*. Where jurors can choose among a broad range of options, such questions are less likely to require a commitment. *Id*.

A venire member's philosophical perspective on the goal of sentencing is a proper subject for voir dire. *Id*. at 518. A trial court abuses its discretion if it does not allow a proper voir dire question. *Id*. Because the State's inquiry was proper under *Davis*, Appellant's trial counsel was not ineffective for not objecting to it. *See id*. at 519; *see also Vrba v. State*, 151 S.W.3d 676, 679 (Tex. App.—Waco 2004, pet. ref'd).

Appellant next complains that the State's inquiry regarding venire members' general views of lengthy prison sentences for first-time alcohol-related offenses was an improper commitment question. *See* Brief for Appellant at 14. However, "[a] question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Sells v. State*, 121 S.W.3d 748, 756 (Tex. Crim. App. 2003). Additionally, as the Court of Appeals observed in *Vrba*,

16

litigants are given "broader latitude" to "inquire into a prospective juror's personal background for the purpose of determining whether that background will adversely affect the juror's ability to decide the case in an impartial manner" and to inquire "into a prospective juror's general philosophical outlook on the justice system."

151 S.W.3d at 678. Furthermore, both the State and the defendant are "entitled to jurors who can consider the entire range of punishment for the particular statutory offense – *i.e.,* from the maximum to the minimum and all points in between." *Cardenas v. State*, 325 S.W.3d 179, 184 (Tex. Crim. App. 2010); *see also* Tex. Crim. Proc. Code Ann. art. 35.16 (a)(9) (bias or prejudice in favor of or against the defendant), (b)(3) (the State may challenge a juror for cause if he has "a bias or prejudice against any phase of the law upon which the State is entitled to rely for … punishment") (West, Westlaw through 2015 R.S.).

The State's precise question sought to determine whether jurors would be "comfortable," *i.e.* could consider the full range of punishment "[i]f the facts of the case support[ed]" a lengthy sentence (*see* II R.R. at 81). It did not ask a question which had no relevance to the jurors' qualifications. *See Barajas v. State*, 93 S.W.3d 36, 40-41, 42 (Tex. Crim. App. 2002) (Womack, J., concurring) (contrasting the overruled *Nunfio* case – which involved facts related to the *victim* – with *Abron* and *Hernandez I*). If jurors had a bias in favor of or against the defendant on account of his age – or against the law, which allowed for a lengthy sentence – the State's question could lead to a valid challenge for cause against

17

that venireman, and would likewise aid in the intelligent use of peremptory strikes. *See Abron v. State*, 523 S.W.2d 405, 409 (Tex. Crim. App. 1975) (holding a defendant should have been allowed to ask whether the race of the defendant and victim would affect prospective jurors' determination to aid the defendant's intelligent use of his peremptory strikes).[1]

Moreover, the State's question sought to *elicit* the venire's preexisting prejudices, not to *instill* new ones in the prospective jurors. *See Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005) ("An improper commitment question attempts to create a bias or prejudice in the venireman before he has heard the evidence, whereas a proper voir dire question attempts to discover a venireman's preexisting bias or prejudice"). The wide variety of responses to the State's questions further demonstrate that they did not compel a given answer, but merely uncovered the venire members' preexisting views (*see generally* II R.R. at 76-94). Because it was not improper to use a scaled question to learn prospective jurors' general views on lengthy prison sentences – an issue applicable to the punishment

---

[1] *See also Hernandez v. State*, 508 S.W.2d 853, 854 (Tex. Crim. App. 1974) ("The question in the instant case, however, merely inquires of a prospective juror, in general terms, whether he could conceive of the possibility that a police officer-witness might lie from the stand"); *Hernandez v. State*, 563 S.W.2d 947, 950 (Tex. Crim. App. 1978) (juror's attitude towards police officers led to inference of bias against appellant, and challenge for cause should have been granted); *Alvarez v. State*, 13-13-00207-CR, 2014 WL 585837, at *8 (Tex. App.—Corpus Christi Feb. 13, 2014) (not designated for publication), *petition for discretionary review refused* (Aug. 20, 2014) (even commitment questions may be proper if they are calculated to uncover grounds for a challenge for cause).

phase of trial – without binding them to resolve the issue in a certain way, Appellant's second complaint is likewise without merit. *See Davis*, 349 S.W.3d at 519.

Appellant's third and fourth alleged "impermissible commitment" questions involve general factors the jury might consider when determining punishment. Brief for Appellant at 15-16. However, these questions, as in *Davis*, "sought to discover which factors would be important to jurors' decisions, without inquiring how those factors would influence the decision." 349 S.W.3d at 519; *see also McCallister v. State*, 05-10-01259-CR, 2012 WL 286801, at *1 (Tex. App.— Dallas Feb. 1, 2012, pet. ref'd) (not designated for publication). For the reasons cited *supra* (at 15, 17-18), Appellant's third and fourth complaint should likewise be dismissed.

**B.      Even if the Questions Would Have Otherwise Been Improper, Trial Counsel Had a Legitimate Strategic Reason Not to Object to the Questions.**

Appellant was aware of the strong evidence that would be presented against him at the sentencing phase – including the testimony of eyewitnesses and relatives of the sympathetic victim – as well as the evidence he and his trial counsel hoped would garner sympathy and mitigate his punishment. He therefore had a high interest in knowing prospective jurors' responses to the State's alleged "commitment" questions.

19

Appellant had a strong interest in knowing the venire members' perspectives on the goals of sentencing – whether they would focus on rehabilitation, retribution, deterrence or punishment. Notably, it was the *defense* counsel in *Davis* which attempted to inquire into the prospective jurors' philosophy on punishment. 349 S.W.3d at 517. In fact, when Appellant's trial counsel began his voir dire, he explicitly acknowledged that he wanted to know the same information when he stated that "[a] lot of the questions and a lot of the same information that I would want to ask you about, [the State] has covered a lot of that so I won't plow a lot of ground over again" (II R.R. at 106).

Appellant's need and desire to know the venire members' responses to the State's questions are also apparent when examining Appellant's use of his peremptory strikes. Appellant used five of his ten peremptory strikes on the following venire members: Gass, Martinez, Wallace, Lopez and Lamoureux (I Supp. C.R.). All five of Appellant's peremptory strike subjects gave responses to the State's questions which were potentially unfavorable to Appellant.[2]

Gass believed the goal of sentencing was "restitution" to "[h]elp the victim recover" (II R.R. at 76, 77). Given the sympathetic victim and the devastating loss

---

[2] Appellant asserts he was harmed by the question regarding the "goal" of sentencing, though he acknowledges only one prospective juror answered this question favorably for him. Brief for Appellant at 17. Notably, the venire member Appellant refers to – Ms. Thompson – was well outside the strike zone and would not have made the jury in any event. *See* II R.R. at 79; I Supp. C.R. (Thompson was at least seven spots past the strike zone).

suffered by her family, Appellant had good reason to want her off of his jury. Gass also believed the most important factor in assessing punishment was the seriousness of the crime (*id*. at 85, 86). Ms. Gass did not believe that a remorseful defendant should be punished less severely (*id*. at 90, 92).

Martinez saw the goal of sentencing as "deterrence" (*id*. at 76, 77) – and Appellant's 80-mile-an-hour intoxicated "driving like a maniac" (IV R.R. at 63) around vans and school buses full of children before killing an innocent, sympathetic victim was a textbook example of the type of conduct one would want to strongly deter. Mr. Martinez was also one of the few to stress the "injury the crime has caused" as the most important factor in assessing punishment (II R.R. at 85, 87). He apparently also did not think a remorseful defendant should be punished less severely (*see id*. at 92).

Wallace saw sentencing's primary purpose as "punishment" (II R.R. at 76, 77). He viewed the seriousness of the crime as the most important factor in assessing punishment (*id*. at 85, 87). Wallace did not see remorse as a particularly mitigating factor (*id*. at 92).

Lopez also believed sentencing's primary purpose was punishment (II R.R. at 76, 77). Lopez further stated that he was "very comfortable" in assessing lengthy prison sentences in response to the State's second question (*id*. at 81, 84). He thought the seriousness of the crime was the most important factor in assessing

21

punishment (*id.* at 85, 89). Mr. Lopez "strongly disagreed" that a remorseful defendant should be punished less severely (*id.* at 90-91, 94).

Lamoureux, like Wallace and Lopez, believed sentencing's primary objective was punishment (II R.R. at 76, 78). She also believed the seriousness of the crime was the most important factor in assessing punishment (*id.* at 85, 89). Like most other venire members, Lamoureux did not believe remorse should result in less severe punishment – a viewpoint she shared with all the other members Appellant used peremptory strikes on. (*id.* at 90, 94).

Appellant acknowledged that the State had covered a lot of the same ground he planned to. Each of the peremptory strikes Appellant exercised involved jurors who gave several potentially unfavorable answers to the State's questions. Accordingly, given Appellant's strong interest in knowing the venire members' philosophy on matters affecting punishment, it cannot be said that trial counsel's strategy to uncover the venire members' views – just as defense counsel attempted to do in *Davis* – fell below an objective standard of reasonableness under prevailing professional norms. *See Strickland*, 466 U.S. at 687–88. Appellant's trial counsel's conduct was not "so outrageous that no competent attorney would have engaged in it." *See Goodspeed*, 187 S.W.3d at 392. As the Supreme Court observed in *Strickland*:

> [j]udicial scrutiny of counsel's performance must be highly
> deferential; it is all too tempting for a defendant to second-guess

22

counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. 466 U.S. at 689.

The acts or omissions complained of by Appellant constituted reasonable trial strategy by counsel.

Appellant has failed to meet his burden to prove ineffective assistance by overcoming the strong presumption that his trial counsel exercised reasonable professional judgment.[3] *See Thompson,* 9 S.W.3d 808, 813–14; *see also Gamble v. State*, 916 S.W.2d at 93 (because the record was silent as to why the appellant's counsel conducted voir dire as he did, and because the appellant had failed to obtain a motion for new trial hearing to develop the record, the court could not conclude trial counsel's performance was deficient). This Court should therefore reject Appellant's claim that his counsel's representation was deficient under the first prong of *Strickland* and affirm the judgment of the trial court. *See Gamble*, 916 S.W.2d at 93.

---

[3] In evaluating the totality of the representation and the circumstances of the case without the benefit of hindsight, it is also notable that Appellant's trial counsel made timely and specific objections to testimony (III R.R. at 63, 120, 126), filed numerous pretrial motions (I C.R. at 12-30, 31 (request for 404(b) notice), 36-51, 56, 59, 61-66, 69 (sworn application for probation), 90), called multiple defense witnesses, many of whom testified to Appellant's "remorse" (III R.R. at 105, 128; IV R.R. at 6, 14), and timely filed Appellant's notice of appeal (I C.R. at 124). Finally, Appellant received less than the maximum sentence allowed by law, and only half the possible fine. Particularly when evaluating the totality of his representation based on the limited record before the Court, Appellant has not overcome the strong presumption that his counsel's performance was not deficient.

**C. Appellant Has Not and Cannot Show There Is a Reasonable Likelihood the Result of the Proceeding Would Have Been Different if Not for Trial Counsel's Alleged Deficiency.**

Furthermore, following Appellant's guilty plea and the substantial and compelling punishment evidence in his case, even if the representation of counsel had been deficient under the first prong of *Strickland*, such deficiency would not be sufficient to undermine confidence in the outcome of the proceeding. In Appellant's case, it is notable that – despite his claim of prejudice on appeal – Appellant did not even exercise his full complement of peremptory strikes at trial (I Supp. C.R. (Appellant only used five of his ten peremptory strikes)). Since he left half of his preemptory challenges unused, Appellant and his trial counsel were apparently pleased with the composition of the jury prior to trial. *Strickland*'s warning that it is "all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence" applies in the context of the prejudice inquiry: Appellant and his trial counsel were in the best position to observe the venire members' demeanor and responses to voir dire, and neither felt the need to exercise Appellant's remaining peremptory strikes from that ideal vantage point. *See Delrio*, 840 S.W.2d at 447 (courts presume that counsel is better

positioned to judge the pragmatism of the particular case, and that he "made all significant decisions in the exercise of reasonable professional judgment").[4]

Moreover, the facts of Appellant's case are particularly egregious. As detailed in the Statement of Facts, *supra*, the victim in this case was a vibrant and relatively young wife and mother. She was clearly deeply loved and relied upon by her entire family – several of whom broke down on the stand (*see* III R.R. at 87, 97, 98). Appellant was a thrill-seeking bull rider who had already violated his

---

[4] A defendant's failure to use his full complement of peremptory strikes is one of the factors *Sanchez* listed for courts to consider in a harm analysis regarding preserved "errors" related to improper commitment questions. 165 S.W.3d at 713. The list of factors includes:

> (1) whether the questions were unambiguously improper and attempted to commit one or more veniremen to a specific verdict or course of action;
> (2) how many, if any, veniremen agreed to commit themselves to a specific verdict or course of action if the State produced certain evidence;
> (3) whether the veniremen who agreed to commit themselves actually served on the jury;
> (4) whether the defendant used peremptory challenges to eliminate any or all of those veniremen who had committed themselves;
> (5) whether the defendant exhausted all of his peremptory challenges upon those veniremen and requested additional peremptory challenges to compensate for their use on improperly committed veniremen;
> (6) whether the defendant timely asserted that a named objectionable venireman actually served on the jury because he had to waste strikes on the improperly committed jurors; and
> (7) whether there is reasonable likelihood that the jury's verdict or course of action in reaching a verdict or sentence was substantially affected by the State's improper commitment questioning during voir dire.

*Sanchez v. State*, 04-02-00624-CR, 2006 WL 1623311, at *4 (Tex. App.—San Antonio June 14, 2006, pet. ref'd) (not designated for publication). As in that latter case, the questions in Appellant's case were not unambiguously improper. In addition to the failure to exhaust his peremptory strikes, veniremen did not "commit" themselves to a certain action, Appellant never asserted an objectionable juror served (because he did not exhaust his peremptories in the first place), and as detailed *infra*, there is not a reasonable likelihood the jury's verdict was affected by the State's questioning, given the compelling punishment evidence in this case.

probation when he decided to drink and drive "like a maniac." He was intoxicated and had a bottle of wine and a marijuana pipe with him in the car. He hurtled around and through traffic – which included vans with children and school buses – at speeds of up to 80 miles an hour, losing control multiple times. He caused a catastrophic wreck which led to Sissy's senseless, gruesome death, not to mention injuries to a pregnant woman and her three-year-old child. At trial, Sissy's family testified about the devastating "void" in their homes and lives (*e.g. id*. at 99, 102). Sissy would never see her daughter Amy's wedding or Sissy's grandchildren. Sissy's mother had to bury a second child. Sissy's devoted husband's life was empty; he had taken to hiding things that reminded him of his wife. Notably, despite witnessing the same emotional testimony as the jury, when Appellant took the stand to testify on his own behalf, he never apologized to the family he had wrecked. Appellant tried to make excuses for his actions, including "concussions" (IV R.R. at 28-31) and claimed he could not remember driving (*id*. at 35-37). Appellant also acknowledged that – despite the conditions of his bond – he continued to use alcohol and marijuana after killing Sissy.

In those circumstances, Appellant cannot plausibly contend that he was prejudiced by his trial counsel's alleged errors. Given the extreme facts of Appellant's case, even if Appellant's "ultimate goal [was] to convince the jury to grant [Appellant] probation" or a lesser sentence, such a goal was unrealistic and

unattainable – even absent the alleged 'errors' of Appellant's trial counsel. *See* Brief for Appellant at 17. Appellant has not and cannot show a reasonable probability that the result of his proceeding would likely have been different had his trial counsel objected to the State's questions. His claim of ineffective assistance of counsel is without merit and should be denied.

## Trial Counsel Was Not Ineffective for Not Objecting to the State's Closing Argument

### *Summary of the Argument*

Appellant claims his counsel's performance was deficient for not objecting to the State's closing statements regarding parole eligibility. However, the State in its comments reiterated the instruction in the charge that the jury was not to consider how the parole laws would apply in Appellant's case. Furthermore, it was *Appellant* who first invited the jury to consider the impact of the deadly weapon finding on his parole eligibility in an attempt to convince the jury to return a shorter sentence. Finally, Appellant cannot show prejudice in any event, given the circumstances of his case.

### A. The State's Closing Argument Was Not Improper.

In his second point of error related to the State's alleged improper closing argument, Appellant quotes the State's explanation of general parole law: "[b]ut

27

what you know is 20 years doesn't mean 20 years." Brief for Appellant at 18. Appellant's brief omits the sentences immediately following that statement, contained in the same paragraph: "A person that's sentenced to 20 years is eligible to get out at ten years or half that sentence. You can't apply that to him, but y'all can use that existence when determining a sentence – the existence of those parole eligibility laws" (IV R.R. at 91). In context, the State was providing a legally accurate description of the law – in fact, paraphrasing language in the jury charge itself:

> It is also possible that the length of time for which the Defendant will be imprisoned might be reduced by the award of parole.
>
> Under the law applicable in this case, if the Defendant is sentenced to a term of imprisonment, he will not be eligible for parole until the actual time served equals one-half of the sentence imposed. Eligibility for parole does not guarantee that parole will be granted.
>
> It cannot accurately be predicted how the parole law and good conduct time might be applied to this Defendant….
>
> You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular Defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

I C.R. at 79. Because the State did not ask the jury to consider the particular manner in which the parole law would be applied to the defendant – and explicitly repeated the charge's warning that "[y]ou can't apply that to him, but you can use that existence when determining a sentence" – the State's accurate statement of the

28

law did not constitute an improper argument, and Appellant's counsel was not deficient for failing to object. *See Flowers v. State*, 133 S.W.3d 853, 858 (Tex. App.—Beaumont 2004, no pet.) (in the context of voir dire statements, "the prosecutor was accurately stating the law, and … the failure of trial counsel to object was not ineffective assistance of counsel").

Additionally, Appellant was the first party to raise the applicable parole laws in closing argument:

> One thing I would like for you to consider though would be to know [that] … if he's convicted and sent to the penitentiary, that he has to serve at least half of the time of the sentence before he's even eligible to be considered for parole …. And there's no guarantee that even after 50 percent of the time, whatever that is, that he would even be given parole.

(IV R.R. at 83). Although Appellant claims the State argued for an improper application of the parole law to his case in closing, the record actually demonstrates that it was Appellant who wanted jurors to consider the application of the parole laws to his case, while the State's response reiterated the law in the charge that the jury could not "apply that to him, but y'all can use that existence when determining a sentence – the existence of those parole eligibility laws" (IV R.R. at 91). *See also Harris v. State*, 784 S.W.2d 5, 12 (Tex. Crim. App. 1989) ("Proper jury argument [includes] … answer to argument by opposing counsel").

Appellant plainly wanted the jury to take the effect of his "deadly weapon" finding into account in the hopes that – knowing he would have to serve at least

29

half his time – they would return a reduced sentence. *See Delrio v. State*, 840 S.W.2d at 446 (even where an "undoubtedly risky" strategy does not pay off, "it does not mean the strategy was unacceptable"). In Appellant's case, the jury actually returned a sentence three years less than the maximum allowed.

Furthermore, because Appellant first introduced and emphasized how the parole laws would apply in his case, he should be estopped from challenging the issue on appeal under the doctrine of invited error. *See Prystash v. State*, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999) (where the Court would not permit the appellant to complain of an omission from the court's charge that he requested, noting "the law of invited error estops a party from making an appellate error of an action it induced"); *see also In re R.J.R.*, 281 S.W.3d 43, 47 (Tex. App.—El Paso 2005, no pet.) (under the doctrine of curative admissibility, "a defendant may waive a prior objection to evidence by offering the same evidence or evidence establishing the same facts as trial").

**B.      Because of His Own Remarks and the Egregious Facts of His Case, Appellant Cannot Establish Prejudice in Any Event.**

Ultimately, Appellant's actions in stressing the applicability of parole laws in his case preclude Appellant from establishing prejudice. Although he complains of the State's "improper application of the parole law" to Appellant, even if the State had not mentioned the parole laws at all, Appellant himself had already

invited the jury to consider the same. Moreover, in light of the extremely compelling punishment evidence in Appellant's case, Appellant cannot demonstrate a reasonable probability that the result of his proceeding would have been different in any event.[5] Accordingly, the Court should reject Appellant's second point of error.

## Trial Counsel Was Not Ineffective for Allegedly Not Testing Appellant's Blood

### *Summary of the Argument*

In his final point of error, Appellant complains that his trial counsel should have tested his blood for the presence of THC, making the baseless assumption that such a test would have proven there was no THC in his blood. However, given the surrounding circumstances in Appellant's case, it is likely that any blood test would have confirmed the presence of THC in Appellant's blood. In any event, Appellant has not and cannot demonstrate that the test would have shown an absence of THC in his blood, and his final point of error should likewise be overruled.

---

[5] To avoid undue repetition, the State relies on its Statement of Facts as well as the secondary summary and argument given *supra* (at 25-27), which are equally applicable here.

## *Argument*

Appellant claims his trial counsel was ineffective for failing to test his blood for the presence of THC. Brief for Appellant at 19. According to Appellant's testimony, he "was out of marijuana for two days" before the wreck (IV R.R. at 64). Appellant has not and cannot establish that the test would have returned have come back negative for the presence of THC. The State also pointed out the implausibility of Appellant's assertion that his glass marijuana pipe – which he claimed was in his center console – ended up outside of his cab near a fence without breaking on its own (*id*. at 65). The State again argued Appellant had attempted to hide the pipe and his marijuana use in closing: "he want's y'all to believe a glass pipe was somehow ejected from his vehicle and landed perfectly unbroken through a fence. That doesn't make any sense" (*id*. at 89).

Given the evidence already available to Appellant's trial counsel, further investigation might only have revealed more harmful evidence which could be used against Appellant. *See Ex parte Martinez*, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006) ("[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments").

Although Appellant claims the blood test results would have been favorable, Appellant has not put forth any evidence to support his speculative assertion. *See*

32

*Robinson v. State*, 03-14-00407-CR, 2015 WL 4515128, at \*9 (Tex. App.—Austin July 22, 2015) (not designated for publication), *petition for discretionary review filed* (Aug. 27, 2015) (the appellant presented no evidence to establish a more thorough investigation would have helped his cause). Because he cannot show the results would have been favorable, and because trial counsel's motivations for allegedly failing to test Appellant's blood for THC are not in the record, Appellant cannot establish that his trial counsel's alleged failure was "so egregious that no effective attorney would have engaged in it." *See id.* Finally, in light of the extremely compelling punishment evidence in Appellant's case, Appellant once again cannot show a reasonable probability that the result of his proceeding would have been different if his counsel had sought further testing – even if his blood had not contained THC – in light of his admitted intoxication and the other egregious facts of his case.[6] The Court should therefore deny Appellant's final point of error.

---

[6] To avoid undue repetition, the State again relies on its Statement of Facts as well as the secondary summary and argument given *supra* (at 25-27), which are equally applicable here.

## **Prayer**

Wherefore, premises considered, Appellee respectfully prays that this Honorable Court of Appeals affirm in all matters the judgment of the trial court in this case.

JENNIFER THARP
Criminal District Attorney

By

/s/ Joshua D. Presley
**Joshua D. Presley**
SBN: 24088254
Assistant District Attorney
150 N. Seguin Avenue, Ste. #307
New Braunfels, Texas 78130
Phone: (830) 221-1300
Fax: (830) 608-2008
E-mail: preslj@co.comal.tx.us
Attorney for the State

## Certificate of Service

I, Joshua D. Presley, Assistant District Attorney for the State of Texas, Appellee, hereby certify that a true and correct copy of this Brief for the State has been delivered to Appellant PAUL DANIEL CAMPBELL's attorney of record in this matter:

Amanda Erwin
amanda@theerwinlawfirm.com
109 East Hopkins Street, Suite 200
San Marcos, TX 78666
Fax: (512) 938-1804
*Attorney for Appellant on Appeal*

By electronically sending it through efile.txcourts.gov to the above-listed email address, this the 30th day of September, 2015.

/s/ Joshua D. Presley
**Joshua D. Presley**

## Certificate of Compliance

I hereby certify, pursuant to Rule 9.4(i)(2)(B) and Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure that the instant brief is computer-generated using Microsoft Word and said computer program has identified that there are 7,662 words within the portions of this brief required to be counted by Rule 9.4(i)(1) & (2) of the Texas Rules of Appellate Procedure.

The document was prepared in proportionally-spaced typeface using Times New Roman 14 for text and Times New Roman 12 for footnotes.

/s/ Joshua D. Presley
**Joshua D. Presley**