

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-18-00054-CR

---

JAMES ALLEN JACKSON, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 273rd District Court
Sabine County, Texas
Trial Court No. CR1607300

---

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

A Sabine County jury convicted James Allen Jackson of continuous sexual abuse of Jane Doe, a child younger than fourteen.[1] In accord with the jury's assessment, Jackson was sentenced to life imprisonment. On appeal, Jackson argues that the trial court erred in admitting e-mail communications with his adult daughter.[2] We affirm the trial court's judgment because we find that Jackson's substantial rights were not affected by the admission of the e-mails.

## I.    Factual Background

At trial, Alice Doe testified that she was in a relationship with Jackson and that her daughters, Jane and Mary, treated Jackson like a father. Alice became pregnant with Jackson's son and believed Jackson to be a good companion. However, approximately one year into their relationship, Alice testified that Jane and Mary both made outcries of sexual abuse against Jackson.

Evelyn Turciso, a forensic interviewer with the Harold's House, East Texas Alliance for Children, testified that she conducted separate interviews of Jane and Mary. While five-year-old Mary simply said that she had told her mother a secret involving Jackson, Jane recounted events of sexual abuse in more detail. A video recording of Jane's forensic interview, which was admitted for the jury, demonstrated that Jane told Turciso that Jackson had "s-e-x" with her. According to Tuciso and the recorded interview, Jane relayed that she and Mary were made to touch the "bad

---

[1]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedent of the Twelfth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

[2]Jackson also appeals from his convictions of aggravated sexual assault of Jane in companion cause number 06-18-00053-CR and continuous sexual abuse of Jane's sister, Mary Doe, a child younger than fourteen, in companion cause number 06-18-00055-CR.

2

spot" "in [Jackson's] pants" several times, that Jackson touched her "bad spot" with his hands "a lot," and that the touching made her feel bad.

According to Kim Riddle, a Sexual Assault Nurse Examiner, Jane said that Jackson had "put his finger in her private and in her butt," and Mary reported that he had touched her vaginal area three times. David West, a sergeant with the Hemphill Police Department, testified that Jackson absconded after the girls made their outcry, but was eventually apprehended in Vermont.

Jackson's friend, Mary Quirk, testified that Jane and Mary acted as if Jackson were their father. Quirk swore that she never saw any inappropriate activity between Jackson and the children and could not imagine he would engage in a sexual act with them because he was a "good person" with a "good heart." Quirk's testimony was echoed by Paula Miller, who was a friend of Jackson's aunt. According to Miller, Jackson broke up with Alice because she was "running around on him" with someone else. Miller claimed that after the July 2016 breakup, Alice told Miller she would "make [Jackson's] life . . . 'a miserable hell.'" Miller testified that Jackson was a member of the "Church of Latter Days Saints" and that the accusations against Jackson surprised her because "he was good to the kids" and "they always wanted to be around [him]."

During cross-examination, both Quirk and Miller testified that Jackson had a good, close relationship with his adult daughter, Lindsay. Miller added that she did not find anything unusual about their relationship. After Jackson's objections to further questioning of Miller about Jackson's relationship with Lindsay were overruled, the State elicited the following:

3

Q. Would a dad -- as you describe a dad -- would a dad have his daughter send him sexy or naked pictures of herself?

A. Actually at one point [Jackson] took me to the emergency room because I needed to go. And he was telling me, like, "Look. I don't know how to handle this. My daughter is sending pictures." He says, "What do I do?" I said, "Tell her not to be doing it." So he did. I was right there when he told her on the phone, "Do not send me pictures like that."

Q. That's what he said, and you heard that?

A. Yes, sir.

At that point, the State sought to introduce Jackson's e-mail communications with Lindsay, which demonstrated the extent of their inappropriate relationship. After the trial court overruled Jackson's objections under Rules 401 through 404 of the Texas Rules of Evidence, the jury saw e-mails from Jackson containing the following statements he had made to Lindsay, among many others:

- "I love getting sexy pics from you."

- "And I know you like mine."

- "I think somehow you have got it in your head that I am some kind of pervert where you are concerned, and that is simply untrue. You have a tendency to make my feelings for you into something dirty."

- "But as a matter of fact it is the purest thing in all of this world. Yes, I am attracted to you, as you are to me. Yes, I want you, and I know damn well you want me."

- "You are young, and a relationship between you and I isn't possible. Ever. So I have to accept what is, and take what of you I can, when I can."

Jackson took the stand in his own defense, stated he was not a child molester, and claimed that he loved the children and that "[t]heir mother told them to say all this garbage." According to

4

Jackson, Alice retaliated after the breakup and threatened to have Jackson "locked up" to prevent him from seeing their son. Jackson also testified that Alice had previously claimed that the children may have been molested by someone else.

Jackson admitted that he had sent the e-mails to Lindsay which had been admitted into evidence. He attempted to explain their relationship by telling the jury that she was the only person who had come to see him while he was previously imprisoned. Jackson testified that he was in segregation "[a]nd [Lindsay] show[ed] up all of a sudden, this beautiful young woman, and we bonded just in an unhealthy way. And then we did send e-mails and pictures and stuff." Jackson testified, "I told her that I'd realized . . . that what we were doing was wrong and that it was unhealthy, and we needed to take a step back and take a look at things again and to start our relationship anew so we could be happy and have a healthy relationship."

## II. Jackson's Substantial Rights Were Not Affected by the Admission of the E-mails

On appeal, Jackson argues that the trial court erred in admitting the e-mails because (1) they were irrelevant to the issue of whether Jackson had committed the offense, (2) the probative value of the e-mails was substantially outweighed by the danger of unfair prejudice, (3) the e-mails were inadmissible under Rule 404(b), and (4) the trial court erred in ruling that Miller's testimony opened the door to allow admission of the e-mails. The State argues that Quirk and Miller's testimony characterizing Jackson as a loving father-figure who had a good relationship with Lindsay opened the door to allow admission of the e-mails under Rule 405(b).[3] Even

---

[3]Rule 404(b) provides that extraneous bad acts are not admissible to prove character conformity. TEX. R. EVID. 404(b)(1); *Tate v. State*, 981 S.W.2d 189, 192 (Tex. Crim. App. 1998). When evidence of a person's character is admissible, Rule 405(a) limits the permissible method of proof to reputation or opinion testimony. TEX. R. EVID.

5

assuming error, if any, we conclude that Jackson's substantial rights were not affected by the admission of the e-mails.

Aside from arguing that the content of the emails was "so against the values of most juror[s] and most people" such that it was "impossible for the [jury] to fairly consider the facts of the rest of the case," Jackson's brief does not further address the issue of harm. "Rule 44.2(b) of the Texas Rules of Appellate Procedure provides that any nonconstitutional error that does not affect substantial rights must be disregarded." *Coleman v. State*, 188 S.W.3d 708, 726 (Tex. App.— Tyler 2005, pet. ref'd) (citing TEX. R. APP. P. 44.2(b)). "Substantial rights are not affected by the erroneous admission of evidence 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'" *Id.* (quoting *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (citations omitted)). "The erroneous admission of an extraneous offense is nonconstitutional error." *Id.* (citing *Johnson v. State*, 84 S.W.3d 726, 729 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd)).

Here, the jury watched the recorded interview with Tuciso in which Jane said Jackson touched her "bad spot" "a lot." Jane's statement further established that she and Mary were made to touch Jackson's sexual organ on several occasions.[4] According to Riddle, Jane said Jackson had "put his finger in her private and in her butt." Riddle also reported that Mary said Jackson touched her vaginal area three times. Further, Alice testified that Mary and Jane had both made

---

405(a); *Tate*, 981 S.W.2d at 192. Rule 405(b) permits proof of specific instances of the person's conduct "[w]hen a person's character or character trait is an essential element of a charge, claim, or defense." TEX. R. EVID. 405(b).

[4]Jackson's conviction for continuous sexual assault of Mary in cause number 06-18-00055-CR was predicated on acts of indecency with the child.

outcries of sexual abuse against Jackson. The jury also heard evidence that Jackson fled the state when he received word of the allegations against him. Given the strength of this evidence, we conclude that it was unlikely that the jury's finding of guilt was adversely affected by the admission of evidence of Jackson's relationship with his adult daughter.

Additionally, "overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling." *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998). The e-mails established that Jackson had an inappropriate relationship with his adult daughter, which he admitted during his direct examination. A defendant cannot complain about the admission of evidence if he "testifie[s] to the same fact when he t[akes] the stand." *Hollis v. State*, 219 S.W.3d 446, 468 (Tex. App.—Austin 2007, no pet.) (citing *Marshall v. State*, 210 S.W.3d 618 (Tex. Crim. App. 2006) ("any error in the admission of the complained-of evidence was harmless [because] . . . appellant brought out essentially the same evidence during his direct examination of [witness]")); *see Esparza v. State*, 699 S.W.2d 326, 328 (Tex. App.—San Antonio 1985, no pet.) ("error . . . was cured when appellant testified to substantially the same evidence on cross-examination"). Therefore, we overrule Jackson's point of error on appeal.

**III.     Conclusion**

We affirm the trial court's judgment.

Bailey C. Moseley
Justice

Date Submitted:     November 13, 2018
Date Decided:       December 21, 2018

Do Not Publish

8